## STATE OF CONNECTICUT *v.* LOUIS FAILLA
### (2181)

TESTO, HULL and BORDEN, Js.

Argued February 1—decision released April 17, 1984

*M. Donald Cardwell,* with whom was *Kenneth J. McDonnell,* for the appellant (defendant).

*Kevin T. Kane,* assistant state's attorney, with whom, on the brief, was *James G. Clark,* special deputy assistant state's attorney, for the appellee (state).

BORDEN, J. The defendant was convicted on one count of conspiracy in violation of General Statutes § 53a-48 and two counts of bribery in violation of General Statutes § 53a-147. The three charges were closely

related, as follows. Under the conspiracy count the state claimed that the underlying crime was bribery; the purpose of the conspiracy was to protect a professional gambling operation in East Hartford; and two of the overt acts were the delivery of money on two occasions to the East Hartford police chief[1] as alleged in the second and third counts. Under the bribery counts the state claimed that on two separate occasions one of the defendant's coconspirators, acting in furtherance of the conspiracy alleged in the first count, bribed the police chief to protect the gambling operation. The defendant appealed to this court, claiming insufficiency of evidence and error in the court's instructions to the jury. We find no error.

The jury could reasonably have found the following facts. George J. Penney, the East Hartford housing code enforcement officer, and Clarence Drumm, the East Hartford police chief, were close friends. In the fall of 1978, Joseph Sheff contacted Penney and asked him to talk to Drumm to see if Drumm would be willing to take money to protect a gambling game in East Hartford which Sheff wanted to operate in safety from police raids. In January, 1979, Penney mentioned the proposition casually to Drumm, who did not take it seriously. Thereafter Penney repeated the proposition to Drumm, telling him that Drumm would be paid $500 weekly to notify Penney of police raids, and that Penney would be paid $100 weekly. Realizing that Penney was serious, Drumm discussed the situation with other law enforcement officials and it was decided that Drumm should encourage Penney in hopes of identifying the people who were behind the scheme. Drumm accepted Penney's offer. Penney relayed the information to Sheff, who told him it would take some time

---

[1] The evidence disclosed that the police chief, after being approached, participated in the scheme in an undercover capacity in cooperation with other law enforcement officials.

because "they" needed to find a place to hold the game. On February 20, 1979, Penney told Drumm that "they" wanted protection from police raids and wanted Drumm to raid another gambling operation in order to eliminate the competition. Sheff told Penney several times that he had a partner. Penney never met the partner, although once he and Sheff went to Hartford to meet him but the meeting did not take place.

In June, 1979, Sheff and the defendant approached Gerald Coderre to rent a room in a building which Coderre owned in East Hartford. Coderre's wife drew up a lease in the defendant's name but at the defendant's request the name was changed before the lease was signed. Sheff and the defendant told Coderre that they would use the room after hours, meaning after 5:30 p.m. Coderre gave the defendant permission to use the telephone in the room, the number of which was 569-2277. The defendant paid Coderre the rent several times. Shortly after the lease was signed Sheff gave Penney the phone number 569-2277 to call if Drumm warned him of a police raid.

On July 9, 1979, Sheff gave Penney an envelope full of money which he gave to Drumm. After the payment Penney told Drumm that he would be given a bonus if he arrested the competition and would be given a percentage of the game receipts once the game was established. On August 10, 1979, Penney gave Drumm $500 which Sheff had given to him.

About two weeks after the lease was signed Coderre tried to enter the room but was refused entry by a man outside the door. A day or two later he entered the room when no one was there and saw crap tables. A few days later Coderre told the defendant that he should not have gambling in the building because the state police headquarters was nearby and police officers often ate at a restaurant next door to the building. The

defendant told Coderre "there is nothing to worry about"; or "[y]ou don't have to worry about it"; but Coderre insisted that the defendant move out of the building. Thereafter no further payments were made to Drumm because the game had ceased and had moved out of the location.

## I

The defendant argues that the evidence was insufficient to support a finding beyond a reasonable doubt that the defendant was a member of the conspiracy to bribe. We disagree.

It is axiomatic that the evidence and the inferences reasonably drawn therefrom "must be given a construction most favorable to sustaining the jury's verdict." *State* v. *Stepney,* 191 Conn. 233, 255, 464 A.2d 758 (1983). It is equally axiomatic that the state must prove the defendant's intent that conduct constituting a crime be performed; that the state need not show a formal agreement so long as the conspirators are " 'knowingly engaged in a mutual plan to do a forbidden act' "; and that "conspiracies, by their very nature, are formed in secret and only rarely can be proved otherwise than by circumstantial evidence." *State* v. *Ortiz,* 169 Conn. 642, 645, 363 A.2d 1091 (1975).

We agree with the state that the evidence was sufficient to prove the defendant a criminal participant in the conspiracy to bribe. The jury could reasonably have found the following facts. Sheff had a partner in his scheme to bribe Drumm through Penney. The defendant arranged for the lease of the room, in a way which would make his interest harder to trace; he paid the rent; and he arranged for the telephone signal which would only be useful if Drumm were bribed. The defendant's lack of concern about police raids was attributable to the fact that he and Sheff had set up an effec-

tive early warning system. Thus, the defendant was Sheff's partner and with Sheff agreed to bribe Drumm.[2]

The evidence was also sufficient for conviction on the bribery counts. Once a defendant's participation in a conspiracy is established, he is responsible for the criminal acts of the other coconspirators within the scope and in furtherance of the conspiracy. *Pinkerton* v. *United States,* 328 U.S. 640, 647–48, 66 S. Ct. 1180, 90 L. Ed. 1489 (1946); *United States* v. *Smith,* 680 F.2d 255, 261 (1st Cir. 1982); see also *State* v. *Klein,* 97 Conn. 321, 328, 116 A. 596 (1922).

## II

The defendant next claims that the court erred in its instructions to the jurors by telling them that they could convict the defendant in the absence of evidence that he knew he was conspiring to bribe and in the absence of evidence that he agreed that bribery be performed. Acknowledging that he neither filed a proper request to charge nor took an adequate exception, he seeks review of this claim under the *Evans* by-pass. See *State* v. *Kurvin,* 186 Conn. 555, 442 A.2d 1327 (1982); *State* v. *Evans,* 165 Conn. 61, 327 A.2d 576 (1973).

Despite this claim made in his brief, the defendant has completely failed to make any showing of "specific support in the record"; *State* v. *DeMatteo,* 186 Conn. 696, 706, 443 A.2d 915 (1982); for such a claim. Indeed, the portion of the charge to which he points, presented in the appendix to his brief, belies the claim. We therefore do not consider it.

There is no error.

In this opinion the other judges concurred.

---

[2] We have reviewed the evidence in the light of the cases cited by the defendant on sufficiency of evidence in conspiracy cases; see, e.g., *United States* v. *Fitzharris,* 633 F.2d 416 (5th Cir. 1980); *United States* v. *Duckett,* 550 F.2d 1027 (5th Cir. 1977); *United States* v. *Falcone,* 109 F.2d 579 (2d Cir. 1940); and find them factually inapposite.