CANTON MOTORCAR WORKS, INC. *v.*
JACK DiMARTINO ET AL.
(3588)

DUPONT, C. J., BORDEN and SPALLONE, JS.

Argued November 6, 1985—decision released March 11, 1986

*Lester Katz,* for the appellants (defendants).

*Stacey L. Savin,* for the appellee (plaintiff).

Borden, J. Following a trial to a jury, the trial court directed a verdict for the plaintiff on one of the counts of its complaint, and the jury returned a verdict for the plaintiff on the remaining counts.[1] The court then rendered judgment for the plaintiff and the defendants appeal. Hereinafter all references to the defendant will refer to the named defendant, Jack DiMartino, except for that portion of this opinion pertaining to claims of error in the court's judgment regarding a surety bond on which the second defendant, Theresa DiMartino, is a surety. In our discussion of the bond, the defendant will be referred to in his capacity as the principal and Theresa DiMartino will be referred to in her capacity as the surety.

On appeal, the defendant assigns the following as error: (1) the trial court's refusal to set aside the verdict on the ground that the plaintiff, a corporation, failed to prove its allegation that it was an assignee of its predecessor, a partnership; (2) the trial court's failure to mark certain proffered items for identification, its imposition of limitations upon the defendant's cross-examination of one of the plaintiff's witnesses and its failure to grant the defendant's motion for mistrial; (3) the court's failure to give a *Secondino* charge as requested by the defendant; (4) the court's award of interest; and (5) the entry of a directed verdict against both defendants on the bond. We find error on the issues concerning the interest and the directed verdict on the bond. The facts pertaining to each issue are set forth in the discussion of each issue.

## I

### Failure of Proof of Assignment

We discuss this issue first because, if the defendants prevail on it, a remand with direction to render judg-

---

[1] Although the jury returned a verdict on all four counts, one of which was directed by the court, its verdict for the plaintiff on the second count,

ment for both defendants would be required. We find, however, no error. Canton Motorcar Works (CMW) was a partnership engaged in the repair and restoration of foreign automobiles. The two partners of CMW were Leigh Miller and Robert Nederostek. In 1977, the two partners joined with one of their employees, James Kelley, and incorporated the automotive repair and restoration business as Canton Motorcar Works, Inc. The following events, which form the basis of the plaintiff's complaint, took place prior to 1977 and therefore involved only CMW, the partnership. We view these facts in the light most favorable to sustaining the jury's verdict. *State* v. *Failla,* 1 Conn. App. 524, 527, 473 A.2d 1233 (1984).

In October, 1975, the defendant visited CMW and informed the partners that he was interested in repairing and restoring his recently acquired 1952 Mercedes Benz coupe convertible. The partners subsequently viewed the car at the defendant's place of business and gave him a rough estimate of the cost of the work. A week later, the defendant brought the car to CMW's place of business where it was partially disassembled and fully inspected. Upon receiving a firm cost estimate of $11,500, the defendant orally agreed to pay that amount and to make periodic payments as the work progressed. During the ensuing weeks, the defendant visited CMW, observed the work in progress, and made payments. He became interested in restoration of the car to its original condition, known as concours condition. Upon discussing the added work that this would entail, he agreed to pay the additional cost of the work. That amount was $3500, thus increasing the full contract price to $15,000.

The defendant stopped visiting CMW in February, 1976. By mid-March, CMW had invested approximately

under which the plaintiff sought damages in quantum meruit, awarded no damages to the plaintiff.

$12,000 worth of time and materials in the project and the defendant had paid approximately $6500. CMW attempted to contact the defendant and, upon finally reaching him, scheduled meetings at which the defendant failed to appear. It became apparent to CMW that the defendant had no intention of complying with the contract. Thus, CMW stopped work in March, 1976, and two months later placed the car and parts in storage.

In October, 1978, the plaintiff filed a complaint alleging, inter alia, breach of an express oral contract, quasi contract, and damages based on the plaintiff's storage of the car and its parts. The plaintiff alleged that it was "the successor in interest to and assignee of all assets of a partnership formerly doing business as Canton Motorcar Works . . . ." The complaint further stated: "Canton Motorcar Works, Inc., and its predecessor, Canton Motorcar Works are hereinafter collectively referred to as the 'plaintiff.' " In his answer and counterclaim, the defendant referred to "the plaintiff" without further designating whether he was referring to CMW or CMW, Inc. The defendant's answer, however, pleads insufficient information regarding the allegation that the plaintiff is the assignee and successor in interest of CMW. In his counterclaim, the defendant alleged damages based on the plaintiff's alleged breach of contract.[2]

At trial, Miller testified that CMW had been engaged in the business of automobile repair and restoration since 1974. When CMW was incorporated in 1977, it kept the same name, operated out of the same address and carried on the same type of business. In addition,

[2] Judgment was rendered against the defendant dismissing this counterclaim, and the defendant's appeal therefrom was dismissed by this court as untimely filed. On appeal, the defendant has attempted to revive, as an appealable issue, the trial court's judgment dismissing his counterclaim. We decline to consider this issue further.

the plaintiff was incorporated by both of the CMW partners. There was no specific evidence introduced of an assignment, by CMW to the plaintiff, of the rights under the contract with the defendant. At the close of all the evidence, the defendant moved for a directed verdict on the ground, inter alia, that the plaintiff failed to prove its allegation that it was the assignee of the claim upon which it was suing the defendant. Upon the trial court's denial of this motion, the defendant moved to set aside the verdict and renewed his claim regarding failure of proof of assignment. This motion was also denied. On appeal, the defendant first claims that the trial court erred by denying the motion to set aside the verdict based on the failure of proof of assignment. We disagree.

There was ample evidence, elicited by both parties, upon which to conclude that the only significant difference between this plaintiff and its predecessor was the change of operating form that the business underwent in 1977. Although the defendant counterclaimed against the corporate plaintiff, we do not construe that as an admission of the plaintiff's right to sue on this contract. The defendant properly pleaded insufficient knowledge regarding the assignment of the claim asserted by the plaintiff; Practice Book § 129; which effectively served as a denial of the plaintiff's right to sue on that claim. See *Second Exeter Corporation* v. *Epstein,* 5 Conn. App. 427, 429, 499 A.2d 429 (1985). Therefore, while the factual allegations pertaining to the creation of this plaintiff as a corporate successor to a predecessor partnership have been proven, the issue remains whether, under the facts of this case, it was necessary as a matter of law for the plaintiff to produce additional evidence of an assignment by its predecessor of these particular contract rights.

This issue has not previously surfaced at the appellate level in this state although it has been decided at

the trial level. See *D.D.J. Electrical Contractors, Inc.* v. *Nanfito & Sons Builders, Inc.,* 40 Conn. Sup. 50, 479 A.2d 1250 (1984). We adopt the reasoning of that case, namely, that the situation presented here is analogous to the situation where one corporation succeeds to the business and rights of a predecessor corporation by merger or consolidation. Id., 52; see General Statutes § 33-369.

General Statutes § 33-369 (c) provides in pertinent part: "Upon the effectiveness of a merger or consolidation [of corporations] . . . [t]he surviving or new corporation shall thereupon and thereafter . . . possess all the rights . . . of each of the merging or consolidating corporations; . . . and all debts due on whatever account, and all other choses in action . . . belonging to or due each of the corporations so merged or consolidated, *shall be . . . vested in such single corporation without further act or deed."* (Emphasis added.) In addition, subsection (b) of that statute provides that upon the effectiveness of a merger or consolidation, "all merging or consolidating corporations parties to the plan of merger or consolidation, except the surviving or new corporation, shall cease." Thus, this legislative mandate, which applies to the merger of corporate business entities, acts automatically to transfer the predecessors' choses in action to its successors, and provides that the former entities, which might otherwise be in a position to assert claims upon those choses in action, cease to exist.

Utilizing this statute as a source of law for application by analogy to the present case, we find ourselves on untraveled but well-charted waters. See, e.g., Landis, "Statutes and the Sources of Law," Harvard Legal Essays (1934). "It is when the colors do not match, when the references in the index fail, when there is no decisive precedent, that the serious business of the judge begins." Cardozo, The Nature of the

Judicial Process, p. 21 (1921). "Statutes are now central to the law in the courts, and judicial lawmaking must take statutes into account virtually all of the time . . . Hardly ever is a statute now regarded as a candidate for narrow construction because it may be in derogation of the common law. More often, the issue is rather to what extent a statute is *itself a source of policy for consistent common law development.*" (Footnote omitted. Emphasis added.) Peters, "Common Law Judging in a Statutory World: An Address," 43 U. Pitt. L. Rev. 995, 998 (1982); see generally Calabresi, A Common Law For The Age Of Statutes (1982). We find General Statutes § 33-369 to be a sound and effective "source of policy for consistent common law development." Peters, supra. As our Chief Justice has aptly noted: "[w]e need to learn how to think about statutes by analogy as aggressively and as extensively as we presently think about cases by analogy." Id., 1002.

In the present case, it is readily apparent that the circumstances surrounding the incorporation of the plaintiff are analogous to the corporate merger situation governed by General Statutes § 33-369. The plaintiff, CMW, Inc., assumed the same name as its predecessor, operated out of the same address, and carried on virtually the same business under the direction of the same principals. In effect, this corporate plaintiff was created as a result of a "merger" with a preexisting partnership. The defendant claims that Nederostek as a former partner in CMW may yet bring suit, thereby exposing the defendant to double liability. We find, however, no support in this record for this assertion. Indeed, Nederostek, as a principal in the corporation which is now suing on this claim, is hardly in a position to sue on this contract once these issues have been litigated and a final judgment rendered. Therefore, the analogy to the corporate merger situation, whereby any would-be claimants cease to exist, is apt.

See General Statutes § 33-369 (b). Thus, we hold that it was unnecessary, under the facts and circumstances of this case, for this plaintiff to prove an assignment of these particular contract rights from its predecessor.

## II

### EVIDENTIARY RULINGS AND DENIAL OF MOTION FOR MISTRIAL

During the trial, the defendant sought to introduce into evidence the parts of the automobile, some of which were contained in boxes. The plaintiff objected to the introduction of the car parts and, at the hearing on the plaintiff's objection, the defendant requested that these proffered items be marked as exhibits for identification. The trial court denied this request. On appeal, the defendant claims that the trial court erred by refusing to mark these items for identification. We disagree.

We recognize the well established general rule regarding the marking of potential evidence for identification. "It [is] manifest error for the court to refuse to permit the [proffered items] to be marked as exhibits for identification. The court [has] no discretion to refuse such a request, because to allow such discretion would permit a trial judge to deprive an aggrieved party of a proper record for an appeal." *Duncan* v. *McTiernan,* 151 Conn. 469, 470, 199 A.2d 332 (1964). Likewise, the failure of a party to have an item marked for identification as an exhibit will preclude review. *Carpenter* v. *Carpenter,* 188 Conn. 736, 745, 453 A.2d 1151 (1982). Nevertheless, because the essential purpose of these rules is to guarantee a proper record upon which the reviewing court may find error and evaluate the harmfulness of error; id.; the rare occasion may arise where "we find an adequate substitute [for this purpose] in the record." *Plawecki* v. *Angelo Tomasso, Inc.,* 1 Conn. App. 48, 49–50 n.3, 467 A.2d 944 (1983). We find this

to be one of those rare instances in which the record provides an adequate substitute for the proffered but unmarked items.

The material in question is a disassembled automobile, which includes everything from nuts and bolts to larger items such as the entire chassis, the engine, fenders, doors and the entire composition of the car's interior. A review of the record indicates that the defendant had admitted as full exhibits forty photographs of the automobile, some of which depict the parts detached from the body before reconstructive work, some showing the parts after work had been done, and others showing the body of the car with and without various parts. The plaintiff had also introduced as full exhibits ten photographs depicting similar material. In addition, the testimony of the witnesses extensively describes the parts depicted in the photographs and the details of the work that had been done on various parts. The jury was permitted to view the photographs while the witnesses testified. Notwithstanding the availability of these fifty photographs and the testimony of the witnesses, the defendant intended to offer the car and parts into evidence, and therefore sought to have these proffered items marked for identification. In support of this request, the defendant argued that some of the photographs depict boxes of the car parts instead of the parts themselves. The trial court ruled that the defendant's request would impose a cumbersome burden upon the court. Although the court indicated its awareness of the general rule regarding such requests, the court refused to mark the proffered items because of the availability of the photographs. Considering the particular and extreme circumstances of the defendant's request, and considering the very complete and vivid substitute in the record for the actual car parts, we conclude that the trial court did not err.

Our review of this entire record reveals that any impact occasioned by the trial court's refusal to mark these items for identification is negligible at best. Of the fifty photographs, only four depict boxes. The other forty six photographs reveal numerous parts of various shapes and sizes. These fifty photographs, combined with the extensive detailed testimony of live witnesses under direct and cross-examination regarding the contents of these photographs, enables us to find in the record an "adequate substitute" for the car parts. See *Plawecki* v. *Angelo Tomasso, Inc.*, supra. We fail to see how the physical availability of these bulky and cumbersome items, either for the jury or for this court, could have possibly added to either the fact-finding or appellate process.

The defendant also assigns as error the trial court's limitation, on two occasions, of his cross-examination of the plaintiff, and the denial of his motion for mistrial. The first of these issues, which pertains to the defendant's attempt to cross-examine the plaintiff in order to elicit the amount of hourly wages paid to the plaintiff's employees, was rendered moot by the verdict, which awarded no damages in quantum meruit. See footnote 1, supra. The plaintiff's objection on the basis of relevance was sustained and the defendant duly excepted. On appeal, we restrict our discussion of this issue to the grounds raised in support of the admissibility of the evidence. See *Patrick* v. *Burns,* 5 Conn. App. 663, 675 n.3, 502 A.2d 432 (1985). That ground is that the proffered evidence is relevant to clarify, if not rebut, the plaintiff's claim of damages based on quasi contract. Because the jury verdict was rendered on the express contract count, this issue, which pertains to quasi contract, is now moot.

The second evidentiary ruling assigned as error arose out of the defendant's testimony regarding an individual who was present during meetings with the plain-

tiff. When asked on direct examination as to the whereabouts of that individual, the defendant stated, "[h]e's in Florida, unfortunately," and later stated, "[u]nfortunately, as I say, he's not here." On cross-examination, the plaintiff introduced into evidence the record of the defendant's prior felony convictions. One record contained convictions in this state for twenty-seven counts of larceny in the first degree, two counts of larceny in the second degree, and one count of conspiracy to commit larceny in the first degree. Another record revealed convictions of two counts of mail fraud in federal court. The plaintiff then sought to cross-examine the defendant regarding the absent witness. The plaintiff asked, "[i]s this the same [witness] that was named as an unindicted coconspirator in the federal indictment that led to your conviction?" The defendant objected on the ground that this question was irrelevant and highly prejudicial. The court overruled the objection on the ground that the defendant had opened the door. On appeal, the defendant claims the court erred. We find error but also find it to be harmless.

We are aware that "[t]he trial court has broad discretion in determining whether cross-examination is beyond the scope of direct examination." (Citation omitted.) *Larensen* v. *Karp,* 1 Conn. App. 228, 230, 470 A.2d 715 (1984). We find, however, that the trial court abused that discretion in the present case. As the trial court noted, the defendant's testimony on direct examination referred to the presence of this witness at significant times when there was dialogue relative to the agreement. The reference to the witness' presence in Florida can only be interpreted as a proper attempt to account for his absence and thus to avoid a *Secondino* charge. We fail to see how that opened any door to his status as an unindicted coconspirator with the defendant. Furthermore, whatever probative value that evi-

dence had must be balanced against its prejudicial effect. The particular prejudice was the tendency of the evidence to impugn the defendant's character by suggesting his association with someone with whom he criminally conspired. "The trial court has a duty to exclude evidence which, 'if admitted, would have a greater prejudicial than probative effect.' " *State* v. *Periere,* 186 Conn. 599, 609, 442 A.2d 1345 (1982). Any probative value of this evidence was outweighed by its potential for prejudice and, therefore, the trial court erred by allowing this question.

It is also apparent, however, that this error was harmless. As previously noted, the prejudice to this defendant inhered in the tendency of the evidence to impugn his character by association with a criminal co-conspirator. We also note, however, that the defendant's credibility had already been substantially impeached by the introduction of his numerous federal and state felony convictions. Thus, the prejudice arising from the introduction of this one additional bit of evidence cannot be said to have had a significantly adverse "impact upon the trier and the result"; *State* v. *Bruno,* 197 Conn. 326, 336, 497 A.2d 758 (1985) (*Shea, J.,* concurring).

The defendant's claim of undue prejudice and error in the denial of his motion for a mistrial is unavailing. "[A] mistrial is only warranted if, as a result of some occurrence, 'it is apparent to the court that . . . a party cannot have a fair trial and the whole proceedings are vitiated.' " *Patrick* v. *Burns,* supra, 673, quoting *Ferino* v. *Palmer,* 133 Conn. 463, 466, 52 A.2d 433 (1947). We cannot say that this single question constitutes an occurrence of such a character that the defendant was deprived of a fair trial.

## III

### Secondino Charge

We next discuss the defendant's claim that the trial court's failure to give a *Secondino* charge, as requested, was error. See *Secondino* v. *New Haven Gas Co.,* 147 Conn. 672, 675, 165 A.2d 598 (1960). We agree, but conclude that the error was harmless because the defendant was, with the court's explicit endorsement, permitted to argue the adverse inference to the jury.

This issue arises out of the plaintiff's failure to call as a witness one of the two partners of CMW, namely Robert Nederostek, notwithstanding his apparent availability to testify. The defendant argues that because of the relationship between Nederostek and the plaintiff, and because Nederostek was present at most of the material contract discussions among the defendant and the partners of CMW, Nederostek was an individual who would naturally be called as a witness by the plaintiff. Thus, the defendant claims that the court erred by failing to instruct the jury, as requested, that they may infer from the plaintiff's failure to call Nederostek that his testimony would have been unfavorable to the plaintiff's case.

The *Secondino* rule is well established. "The failure of a party to produce as a witness one who is available and who naturally would be produced permits the inference that such witness, if called, would have exposed facts unfavorable to the party's cause. . . . To take advantage of this rule permitting an adverse inference, the party claiming the benefit must show that he is entitled to it." (Citations omitted.) *State* v. *Brown,* 169 Conn. 692, 704, 364 A.2d 186 (1975). The requirements of the rule " 'must be complied with strictly because

of the potentially critical effect of such an inference.' " *Fontaine* v. *Coyle,* 174 Conn. 204, 212, 384 A.2d 616 (1978).

Whether a witness is one who is available and who naturally would be produced by a party are questions of fact for the jury to find as preconditions to drawing the adverse inference. *Fontaine* v. *Coyle,* supra, 209. The court's role is to make a preliminary determination that the party claiming the benefit of the inference produced sufficient evidence to support a finding of these facts. If that showing has been made, the court should present the issue to the jury with appropriate instructions.

The record indicates that Nederostek lived and worked in the Hartford area and was available to testify at trial. Thus, the determinative issue is whether Nederostek is a witness whom the plaintiff naturally would produce.

" 'A witness who would naturally be produced by a party is one who is known to that party and who, by reason of his relationship to that party or to the issues, or both, could reasonably be expected to have peculiar or superior information material to the case which, if favorable, the party would produce.' *Secondino* v. *New Haven Gas Co.,* supra, 675." *Grabowski* v. *Fruehauf Trailer Corporation,* 2 Conn. App. 167, 170, 477 A.2d 685 (1984). Clearly, Nederostek was known to the plaintiff. He had been a partner in CMW and a principal in CMW, Inc. In addition, by virtue of his relationship to the plaintiff and the evidence that he was present during material discussions between the parties, he could reasonably be expected to have peculiar or superior information material to the case.

It is also reasonable to conclude that if Nederostek's information were favorable, the plaintiff would have produced it. The principal dispute between the parties

centered around the terms and conditions of an oral contract. In addition, the plaintiff's quantum meruit claim and the defendant's counterclaim; see footnote 2, supra; placed in issue the extent of damages, if any, which the respective parties suffered. Because of the absence of a written contract, and because of the uncertainty regarding damages suffered by the parties, the testimony of Nederostek, if favorable to the plaintiff, could have added persuasive effect to the preponderance of the plaintiff's evidence on these issues. Although there is an admittedly fine line between cumulative and noncumulative evidence; see 2 Wigmore, Evidence (3d Ed.) § 287; we believe that under these circumstances the evidence was not cumulative. We conclude, therefore, that it was error to refuse to give the *Secondino* instruction requested by the defendant.

Having reached this conclusion, we also conclude, however, that this error was harmless. During his final argument to the jury, the defendant proceeded to discuss the fact that the plaintiff did not call Nederostek as a witness. The plaintiff objected during this summation when the defendant intimated that, from this fact, the jury was permitted to draw an adverse inference. In response to an inquiry from the court, the defendant stated: "I'm telling the jury that they can infer that Mr. Nederostek would not have backed up the story of Mr. Miller but would have testified adversely to him . . . ." The court stated: "You may tell them that if you wish, counselor."

Although this practice is unorthodox and not to be condoned; cf. *State* v. *Daniels,* 180 Conn. 101, 113–14, 429 A.2d 813 (1980) (procedure to be followed in criminal cases for *Secondino* charge); we conclude that the statements of the defendant's counsel, buttressed by the court's express approval, effectively "instructed"

the jury that they may draw the desired adverse inference. Thus, the error in failing to give the instruction was harmless.

## IV

### INTEREST

We next address the defendant's claim that the trial court erred in its award of interest as damages. This claim raises two interrelated issues: (1) whether the award of interest was properly made by the trial court rather than by the jury; and (2) whether the amount of the interest awarded was erroneous. Because we conclude that the trial court erred by applying interest to the verdict, instead of leaving for the jury the question of whether interest should be applied, we do not discuss the related issue of whether the amount of interest applied by the court was incorrect.

The jury returned a verdict on the breach of contract count in the amount of $5712. The court accepted this verdict and rendered judgment accordingly, adding interest calculated at the rate of 10 percent per year from March 19, 1976. This date was found by the court to be the date on which the defendant's obligation became due and owing. The jury verdict on the count for damages based on the plaintiff's storage of the vehicle totalled $3940. The court accepted this verdict and rendered judgment, again adding interest at the rate of 10 percent per year. The court determined July 12, 1978, to be the date on which this debt became due and owing and calculated interest from that date. The defendant claims that the court erred by awarding interest. We agree.

Section 37-3a of the General Statutes provides in part that "interest . . . may be recovered and allowed in civil actions . . . as damages for the detention of money after it becomes payable . . . ." It is well estab-

lished that "[t]he amount of damages to be awarded is a matter particularly within the province of the jury." *Eagar* v. *Barron,* 2 Conn. App. 468, 471, 480 A.2d 576 (1984). Our cases have recognized that interest, as an element of damages, is also a matter within the jury's province. Id.; see also *Rosenblatt* v. *Berman,* 143 Conn. 31, 36, 119 A.2d 118 (1955); *Lokes* v. *Kondrotas,* 104 Conn. 703, 709, 134 A.2d 246 (1926). This principle derives from the recognition that "the question of [interest as] damages . . . is . . . inextricably mixed" with the merits of the underlying claims. *Rosenblatt* v. *Berman,* supra, 39. In each case, the jury must determine whether the detention of the money is wrongful under the circumstances, and whether justice requires the allowance of interest as damages for the loss of use of money. *Sperry* v. *Moler,* 3 Conn. App. 692, 694–95, 491 A.2d 1115 (1985). Although one case allowed the court to compute interest after a jury had awarded interest but failed to compute it, because such a computation would involve nothing more than a straight mathematical calculation; *Nigro* v. *Hagearty,* 33 Conn. Sup. 609, 611, 364 A.2d 241 (1976); this is not such a case.

In the present case, the jury verdicts did not include a finding that interest was due, nor did the verdicts include a finding of the dates from which interest, if any, was to be calculated. Therefore, we conclude that the trial court erred by finding these facts instead of leaving to the jury, under appropriate instructions, the questions of whether interest should be awarded, and, if so, the calculation of the amount of interest.

## V

### JUDGMENT ON SURETY BOND

As a prejudgment remedy, the plaintiff was granted an artificer's lien upon the defendant's automobile. Subsequently, the defendant filed a motion to dissolve this

lien upon the substitution of a bond with surety pursuant to General Statutes § 49-61. The motion was granted upon the defendant's execution, as principal, of a bond in the amount of $11,000 with the defendant's wife, Theresa DiMartino, as surety.

In the fourth count of the complaint, the plaintiff alleged, inter alia, that "[s]aid bond remains in full force and effect unless the defendant, Jack DiMartino, shall pay or cause to be paid, any judgment that may be rendered against him herein not exceeding the amount of $11,000.00, with interest and costs, or on default of such payment shall pay or cause to be paid to the officer having the execution issued in such judgment, on demand, the actual value of said automobile as of April 29, 1978, not exempt from such lien, not exceeding said amount of $11,000.00." The defendants admitted this allegation. At the close of all of the evidence, the plaintiff moved that the court instruct the jury to enter a directed verdict on this count because of the defendants' admissions. The defendants objected on the ground that they merely admitted the allegations of the complaint which pertained to the existence of the bond. The defendants argued that, regardless of their admissions, there was no viable cause of action alleged because there was no allegation in the complaint that a judgment had been rendered against Jack DiMartino which was unpaid. The court overruled the defendants' objections and directed a verdict in favor of the plaintiff on this count. The defendant, Theresa DiMartino, subsequently raised this ground as a basis upon which the court should set aside the verdict. On appeal, the defendants claim that the court erred by refusing to set aside the directed verdict. We agree.

The bond expressly states that "[t]he condition of this obligation is such that . . . if said Jack DiMartino shall pay or cause to be paid any *judgment* that may be rendered against him by any court of competent jurisdic-

tion not exceeding the amount of Eleven Thousand ($11,000) dollars, with interest and costs, *or in default of such payment shall pay or cause to be paid to the officer having the execution issued on such judgment,* on demand, *the actual value of the date hereof* of [one 1952 Mercedes Benz automobile] . . . not exceeding said amount of Eleven Thousand ($11,000) dollars, then this bond shall be void, *but otherwise* in full force and effect." (Emphasis added.) By its terms, Jack DiMartino, as principal, and Theresa DiMartino, as surety, are bound jointly and severally for the payment of the penal sum indicated.

We disagree with the plaintiff that the defendants' admissions regarding the material allegations of the pertinent count of the complaint constituted a basis upon which to direct a verdict on this count. The answer merely admits the alleged *execution* and *existence* of the bond. It does not admit the *legal effect* of the bond, namely, the existence of a judgment against the principal which is unpaid.

Second, we note that the plaintiff does not dispute the defendants' reading of the language of the bond. In this regard, the defendants' brief states: "Even a cursory reading of the bond . . . indicates that the plaintiff has no right at all under the bond until such time as a judgment had been entered against the defendant, Jack DiMartino, and was unpaid." We agree with the defendants that the plain meaning of these terms indicates that the defendants' obligations under the bond were, at most, conditional obligations as of the date of the judgment on the underlying cause of action.

Finally, it is apparent from the language of the bond that a separate proceeding is contemplated in which the conditions of the bond might be proven and the surety would be given an opportunity to assert any avail-

able defenses. The bond binds the defendants jointly and severally, subject to the condition that it shall be void if the defendant, Jack DiMartino, "shall pay or cause to be paid any judgment that may be rendered against him . . . not exceeding the amount of . . . $11,000, with interest and costs, or in default of such payment shall pay or cause to be paid to the officer *having the execution issued* on such judgment, on demand, *the actual value at the date hereof* of such personal property . . . not exceeding . . . [$11,000.]" Thus, the bond contemplates: (1) a determination whether the defendant, Jack DiMartino, is in default on the underlying judgment secured by the bond; (2) if so, whether he has refused to pay on demand of the officer having execution issued on such judgment; and, (3) if so, whether the value of the automobile, and of his interest in that automobile, as of the date of the issuance of the bond exceeds the penal sum of $11,000. See *Whitney Frocks, Inc.* v. *Jaffe,* 138 Conn. 428, 85 A.2d 242 (1951). In addition, at such a proceeding the defendant surety would be entitled to assert any defenses as may be available to her. See generally *American Oil Co.* v. *Valenti,* 179 Conn. 349, 353, 426 A.2d 305 (1979).

We see no reason, however, under the procedural posture of this case, to require that those separate proceedings on the bond be a second lawsuit. All the necessary parties are in court. Once the matter of interest as damages is resolved and the principal on the bond is given a reasonable amount of time to pay the judgment, judicial economy suggests that the remaining issues on the bond may then be litigated within the context of the same lawsuit.

There is error in part, the judgment against the defendant, Jack DiMartino, is set aside and a new trial is ordered limited to the question of interest as damages, and the judgment against both defendants on the

bond is set aside and the case is remanded for further proceedings on the fourth count of the complaint in accordance with this opinion.

In this opinion the other judges concurred.