CMG REALTY OF CONNECTICUT, INC., ET AL. *v.*
COLONNADE ONE AT OLD GREENWICH LIMITED
PARTNERSHIP ET AL.
(12300)

DUPONT, C. J., and HEIMAN and SPEAR, Js.

Argued September 21, 1994—decision released January 31, 1995

*David M. Wallman,* for the appellant-appellee (named plaintiff).

*Paul L. McCullough,* for the appellees-appellants (defendants).

SPEAR, J. The sole issue on the appeal by the named plaintiff[1] is whether a clause that required the defendant owners[2] to pay the plaintiff broker $50,000 to terminate a brokerage contract was an unenforceable penalty. The issue[3] on the defendants' cross appeal is whether a brokerage contract made "as of" July 1, 1988, satisfies the date requirement of General Statutes § 20-325a (b) (3)[4] where the plaintiff broker was not incorporated until August 15, 1988, and did not sign the contract until October, 1988. We affirm the judgment of the trial court.

[1] The trial court rendered judgment on the complaint in favor of the named plaintiff, CMG Realty of Connecticut, Inc. (CMG Realty). The plaintiff Constance Greene, a licensed real estate broker and president of CMG Realty, withdrew her complaint prior to trial. As used in this opinion, the plaintiff refers to CMG Realty.

[2] The defendants are Colonnade One at Old Greenwich Limited Partnership (Colonnade One), Old Colonnade Limited Partnership, Collins Colonnade Limited Partnership, Arthur Collins and YTB (Leasing) America, Inc. The trial court rendered judgment against all of the defendants as partners even though only Colonnade One was a party to the contract at issue.

[3] We will not review the defendants' claims that exhibit D, which is the basis for $12,000 of the judgment, did not meet the requirements of General Statutes § 20-325a. See footnote 7. That claim was not raised in the trial court and we decline review pursuant to Practice Book § 4185, which provides in pertinent part: "The court on appeal shall not be bound to consider a claim unless it was distinctly raised at the trial . . . ."

[4] General Statutes § 20-325a provides in pertinent part: "ACTIONS TO RECOVER COMMISSIONS ARISING OUT OF REAL ESTATE TRANSACTIONS. (a) No person who is not licensed under the provisions of this chapter, and who was not so licensed at the time he performed the acts or rendered the services for which recovery is sought, shall commence or bring any action in any court of this state, after October 1, 1971, to recover any commission, compensation or other payment in respect of any act done or service rendered by him, the doing or rendering of which is prohibited under the provisions of this chapter except by persons duly licensed under this chapter.

"(b) No person, licensed under the provisions of this chapter, shall commence or bring any action in respect of any acts done or services rendered after October 1, 1971, as set forth in subsection (a), unless such acts or services were rendered pursuant to a contract or authorization from the person for whom such acts were done or services rendered. To satisfy the requirements of this subsection any such contract or authorization shall (1) be in writing, (2) contain the names and addresses of all the parties

The plaintiff sought money damages from the defendants for breach[5] of a contract that gave the plaintiff the exclusive right to market and sell units in a 178 unit condominium development that the defendants were constructing in Greenwich. The contract provided that the plaintiff would receive a draw of $12,000 a month against a 1 percent commission for each unit sold. The defendants were also responsible for certain of the plaintiff's employee costs and miscellaneous expenses. The defendants counterclaimed in two counts alleging (1) that the plaintiff had breached the contract and (2) that the defendants were entitled to a refund of the plaintiff's draw that exceeded earned commissions.

The case was tried to an attorney trial referee who recommended judgment for the plaintiff as against Colonnade One in the amount of $63,250. The referee also recommended that the plaintiff be awarded attorney's fees incurred to recover the $50,000 termination fee that was included in the recommended judgment. The referee further recommended that judgment be rendered in favor of the plaintiff on both counts of the defendants' counterclaim.[6]

---

thereto, (3) *show the date on which such contract was entered into or such authorization given,* (4) contain the conditions of such contract or authorization and (5) be signed by the owner or an agent authorized to act on behalf of the owner only by a written document executed in the manner provided for conveyances in section 47-5, and by the real estate broker or his authorized agent." (Emphasis added.)

[5] The complaint alleges, inter alia, that the defendant Colonnade One terminated the agreement for no cause and as a result obligated itself to pay the plaintiff $50,000 as a termination fee. There is no express allegation that Colonnade One breached the contract by failing to pay the termination fee. That was the issue, however, that was tried. We will treat the case as the parties treated and presented it at trial. See *Lambrakos* v. *Carson,* 174 Conn. 482, 485, 391 A.2d 142 (1978); *State* v. *Beauton,* 170 Conn. 234, 237, 365 A.2d 1105 (1976); *Ives* v. *Burgess,* 155 Conn. 698, 699, 231 A.2d 276 (1967).

[6] The attorney trial referee also recommended an offer of judgment interest award based on General Statutes § 52-192a because his recommended

After a hearing on the objections and exceptions to the referee's report, the trial court found that the $50,000 fee was in fact a penalty, which could not be recovered. The court rendered judgment for the plaintiff against all of the defendants in the amount of $13,250[7] plus interest from April 2, 1990, for money "wrongfully detained." The court denied the plaintiff's claim for attorney's fees and rendered judgment in favor of the plaintiff on the defendants' counterclaim.[8]

The plaintiff claims in its appeal that it was entitled to the $50,000 termination fee and attorney's fees.[9] The defendants claim in their cross appeal that the contract was unenforceable because it did not satisfy the date requirement of § 20-325a (b) (3).[10]

I

We first address the issue raised in the defendants' cross appeal as to the enforceability of the contract. There is no dispute that the subject contract was a real estate brokerage agreement that must comply with all of the provisions of § 20-325a (b) to be enforceable. It is also undisputed that the plaintiff was incorporated on August 15, 1988, that the contract was signed by all of the parties in October, 1988, that the plaintiff was licensed at the time that this action was brought and

judgment exceeded the $49,000 offer of judgment. There is no need to discuss this issue as we affirm a judgment of less than $49,000.

[7] This sum represents $12,000 for the monthly draw of March, 1990, and $1250 as salary reimbursement for a public relations employee of the plaintiff.

[8] The judgment file states that the defendants' objections to the report "should be denied." The defendants only objection was as to the $50,000 termination fee and the court's memorandum of decision and judgment make it clear that the court actually sustained that objection.

[9] The plaintiff asks that we remand the case to the Superior Court for further proceedings on its claim for attorney's fees in the event that we reverse the trial court as to the termination fee. Our affirmance of the trial court's judgment obviates the need for such a remand.

[10] See footnote 4.

that the plaintiff was licensed at the time that the services were rendered.

The statutory scheme of § 20-325a requires that a party who sues for a real estate commission must first show that the written contract or authorization under which the claim is made satisfies the *facial* requirements of the statute as to names, addresses, date, conditions and signatures. Additionally, the party must also show licensing at the two critical times: (1) at the time the action is brought; and (2) at the time the services are rendered.

Section 20-325a (b) (3) of the statute can be satisfied either by a written contract that states the date on which it was entered into by the parties or a written authorization that shows the date on which the services of the broker were authorized by the owner. The defendants claim that neither date requirement of General Statutes § 20-325a (b) (3) was met. We disagree.

A

The trial court found that the broker's services were "authorized" as of July 1, 1988, and, therefore, the contract satisfied the statute. The defendants assert that the plaintiff could not possibly have received authorization from the defendants as of July 1, 1988, because the plaintiff did not come into existence until August 15, 1988. We agree.

The trial court relied on *Arruda Realty, Inc.* v. *Doyon*, 35 Conn. Sup. 617, 401 A.2d 625, cert. denied, 176 Conn. 763, 394 A.2d 201 (1978). In ruling on an appeal from a summary judgment, that court held that a listing agreement that stated, " '[t]his agreement will be effective commencing Sept. 17, 1976' "; id., 619; complied with the date requirement of § 20-325a (b) because *"authorization* could be found to have been given on September 17, 1976." (Emphasis added.) Id., 620.

Authorization is official approval or permission. See Webster's Third New International Dictionary. By signing the contract, the defendant owners authorized the plaintiff broker's services from that date forward. Retroactive authorization of those services that were rendered prior to the contract's signing date could have been accomplished only by the defendants' ratification of those acts that constituted the services. "Ratification is defined as the affirmance by a person of a *prior act* which did not bind him but which was done or professedly done on his account. . . . Ratification requires acceptance of the results of the act with an intent to ratify, and with full knowledge of all the material circumstances." (Citation omitted; emphasis added; internal quotation marks omitted.) *Russell* v. *Dean Witter Reynolds, Inc.*, 200 Conn. 172, 185, 510 A.2d 972 (1986). Authorization by ratification could be found for actions that occurred from the date that the contract was signed retroactive to August 15, 1988, when the plaintiff corporation came into existence. The plaintiff did not exist, however, during the period from July 1, 1988, to the time of its incorporation on August 15, 1988. It could not have performed any acts during that period that were capable of ratification by the defendant. Retroactive authorization as of July 1, 1988, was not possible,[11] and, therefore, the trial court's legal conclusion that there was such authorization cannot stand.

## B

The defendants also assert that the July 1, 1988 date did not comply with the alternative statutory requirement that a brokerage contract show the date on which it was entered into by the parties because the contract was actually signed on October 15, 1988. The trial court did not rule on this claim because it found authoriza-

[11] There is no claim that the plaintiff had a "de facto" existence prior to its date of incorporation.

tion for the broker's services as of July 1, 1988. We conclude that the contract date requirement of the statute, rather than the authorization date, was satisfied here. The parties briefed and argued both date alternatives and "[t]his court is authorized to rely upon alternative grounds supported by the record to sustain a judgment." (Internal quotation marks omitted.) *Kelley* v. *Bonney*, 221 Conn. 549, 592, 606 A.2d 693 (1992); *Latimer* v. *Administrator*, 216 Conn. 237, 252, 579 A.2d 497 (1990); *In re Jennifer G.*, 29 Conn. App. 689, 692, 617 A.2d 921 (1992).

We first note that the cases cited by the defendants in support of their claim that the July 1 date does not comply with the contract date provision of the statute furnish little guidance as they all involved *omissions* that were apparent on the face of each document. *New England Land Co.* v. *DeMarkey*, 213 Conn. 612, 569 A.2d 1098 (1990) (failure to identify particular sales price); *Hossan* v. *Hudiakoff*, 178 Conn. 381, 423 A.2d 108 (1979) (failure to include broker's address); *Boline* v. *Albert*, 23 Conn. App. 688, 583 A.2d 945 (1991) (failure to include special conditions of agreement); *Rostenberg-Doern Co.* v. *Weiner*, 17 Conn. App. 294, 552 A.2d 827 (1989) (failure to include rate of broker's commission). These cases shed no light on the issue of whether an execution date that is different from the date on the face of the contract renders the date on the contract invalid pursuant to § 20-325a (b) (3).

We conclude that the July 1, 1988 date satisfies the statute because it is the date on which the parties chose to become contractually bound. This "as of" date is the effective date of the contract for two reasons. First, the parties are free to contract as they wish and, second, a corporation may adopt rights and obligations that predate its existence.

Parties are always free to contract as they see fit as long as the contract does not violate any law or public

policy. "It is established well beyond the need for citation that parties are free to contract for whatever terms on which they may agree." *Holly Hill Holdings* v. *Lowman*, 226 Conn. 748, 755, 628 A.2d 1298 (1993); see also *Collins* v. *Sears, Roebuck & Co.*, 164 Conn. 369, 377, 321 A.2d 444 (1973); 17A Am. Jur. 2d, Contracts § 174 (1991). We discern no reason here why the parties could not agree on the date when they would become contractually bound, whether that date was before (or after) the date on which they actually signed the contract.

A corporation can acquire rights and subject itself to duties with respect to preincorporation matters. A contract made in the name of an inchoate corporation can be enforced after the corporation is organized on the principle of ratification. *Cramer* v. *Burnham*, 107 Conn. 216, 219, 140 A. 477 (1928). We note that such ratification here would not be subject to the infirmity discussed above where we concluded that the doctrine of ratification could not be used to show that the defendants authorized the plaintiff's services as of July 1, 1988. By signing the contract, the plaintiff did not *receive* authorization as of July 1, 1988, but rather *gave* its authorization to others for acts performed between July 1, 1988, and the date of the contract. Such authorization would be by way of ratification of those acts, including any acts that were performed prior to the plaintiff's incorporation. There is no claim that any acts subject to such ratification by the plaintiff were performed by a person or entity that was not in existence on July 1, 1988. The attorney trial referee specifically found that Constance Greene, the plaintiff's president, and Colonnade One, the other party to the contract, were in existence on July 1, 1988. A corporation can also be liable for the value of goods sold to its incorporators prior to incorporation where the articles were for the corporation's use and benefit; *Langendorfer* v.

*Morse Oil Co.,* 115 Conn. 706, 161 A. 193 (1932); and we have held that a corporation has the right to sue on a preincorporation debt owed to its predecessor. *Canton Motorcar Works, Inc.* v. *DiMartino,* 6 Conn. App. 447, 452–53, 505 A.2d 1255, cert. denied, 200 Conn. 802, 509 A.2d 516 (1986).

Under the circumstances here, we see no reason why the plaintiff could not bind itself to a contract dated earlier than its date of incorporation. We conclude that § 20-325a (b) (3) is satisfied because July 1, 1988, is the effective date that the parties agreed to be bound by the contract.

### C

The defendants' last claim with respect to the date is that because the plaintiff did not exist on July 1, 1988, it could not have been licensed on that date, and that § 20-325a thus prohibits this action. We disagree.

Section 20-325a (a)[12] requires that, in order to bring an action for a broker's commission, the plaintiff must (1) be licensed and (2) have been licensed at the time that services were rendered. There is no claim that the plaintiff was not licensed when it brought this action. Although there are penalties for engaging in the real estate brokerage business without a license,[13] § 20-325a does not require that the party who brings an action for a real estate commission be licensed at the time the contract is made or authorized. The defendants do not assert that the plaintiff performed any of the services for which compensation was claimed prior

---

[12] See footnote 4.

[13] General Statutes § 20-312 prohibits one from acting as a real estate broker without a license. General Statutes § 20-325 (a) provides in pertinent part that "[a]ny person who engages in the business of real estate broker . . . without obtaining a license . . . shall be fined not more than one thousand dollars or imprisoned not more than six months or both . . . ."

to its being licensed. Lastly, there is no claim that the trial court awarded the plaintiff any commissions for unlicensed services. On the contrary, the evidence clearly shows that the plaintiff was properly licensed at the time that the action was brought and during the times that the services were rendered. Under these circumstances, § 20-325a presents no bar to the plaintiff's action and subsequent recovery.

## II

On its appeal, the plaintiff claims that it is entitled to a $50,000 fee pursuant to § 12B (iii) (a)[14] of the contract because the defendants terminated the contract without cause. The plaintiff first asserts that the trial court improperly substituted its own factual finding of a penalty for that of the attorney trial referee who found an enforceable termination fee. The plaintiff also asserts that the $50,000 fee could not be a penalty because it was an alternative performance that was bargained for by the parties. We disagree with both of the plaintiff's contentions.

## A

The plaintiff's claim that the trial court substituted its factual findings for those of the attorney trial referee is without merit. The trial court rejected the referee's legal conclusion that the $50,000 fee provided for in § 12B (iii) (a) was properly payable as a termination fee. On the same facts as found by the referee, the trial court came to a different legal conclusion, i.e., that the subject clause was a penalty and not a termination clause.

---

[14] Section 12B (iii) of the contract provides in relevant part: "Should Owner decide to terminate the services of Broker without cause, which shall, without limitation, include project delay or hold, Owner shall be liable to pay Broker as follows: (a) If termination occurs prior to the sale of eighty-four (84) Units, the sum of Fifty Thousand ($50,000.00) Dollars . . . ."

The attorney trial referee made no specific findings in his report as to the intent of the parties regarding the $50,000 fee. He found that the plaintiff was terminated without cause and, therefore, was legally entitled to the specified termination fee. He reasoned that as the contract was plain and unambiguous, it "must be followed in accordance with its terms." It is clear that the attorney trial referee dealt with this provision as a matter of law that could be resolved by analyzing the plain language of the contract. This approach was proper because "[w]here there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law." (Internal quotation marks omitted.) *Bank of Boston Connecticut* v. *Schlesinger*, 220 Conn. 152, 158, 595 A.2d 872 (1991).

The trial court, however, is not bound by the legal conclusions of an attorney trial referee. Practice Book § 443 provides in relevant part that "[t]he court shall render such judgment as the law requires upon the facts in the report as it may be corrected." "The views of [an attorney trial referee] upon the law carry no more force than those of the parties in their arguments at the hearing before the court that is to enter judgment." *Seal Audio, Inc.* v. *Bozak, Inc.*, 199 Conn. 496, 510, 508 A.2d 415 (1986). "The reviewing court is the effective arbiter of the law and the legal opinions of [an attorney trial referee], like those of the parties, though they may be helpful, carry no weight not justified by their soundness as viewed by the court that renders judgment." Id.

The trial court properly concluded that the termination fee was a penalty as it was not related to any damages that the plaintiff would suffer in the event of a breach by the defendants. "If the provision was inserted for the purpose of deterring the defendant from breaching his contract and of penalizing him for

doing so, instead of specifying a sum which the parties in good faith agreed upon as representing the damages which would ensue from a breach, it is to be regarded as imposing a penalty." *May* v. *Young*, 125 Conn. 1, 9, 2 A.2d 385 (1938); *Hanson Development Co.* v. *East Great Plains Shopping Center, Inc.*, 195 Conn. 60, 65, 485 A.2d 1296 (1985).

The penal nature of the clause is reinforced by § 12B (iii) (b) of the contract that provides for a $100,000 fee if termination occurs *subsequent* to the sale of eighty-four units. This doubling of the fee after the project achieved a certain level of success could only serve as a deterrent to the defendants' terminating the plaintiff's services without cause.

We are unpersuaded by the plaintiff's claim that termination of the contract was a right that the defendants bargained for in exchange for the payment of $50,000. The "right" to terminate under the circumstances here is legally indistinguishable from the power to breach a contract possessed by any party whose contractual duties are executory. The contract language itself mandates this conclusion. Section 12B (ii) provides in pertinent part: *"Termination by Cause:* This Agreement may be terminated by either affected party for cause, which shall be defined as a material breach by either party of its obligation set forth in this Agreement. . . . If the Agreement is terminated by Broker [for cause], it shall be treated as a termination without cause by Owner as described in subparagraph 12B (iii) of this section below, and Broker shall be entitled to receive compensation in accordance with the provisions of subparagraph 12B (iii)." Pursuant to this clause, a termination by the defendant without cause is treated the same way as if the defendant had breached the agreement. Furthermore, termination without cause by the defendants would not extinguish their obligations under the contract. The duty to pay

certain commissions after termination[15] and to indemnify the plaintiff[16] could not be discharged by payment of the $50,000. This is precisely the situation that obtains upon a breach; the breaching party is not discharged from contractual responsibilities. *Batter Building Materials Co.* v. *Kirschner*, 142 Conn. 1, 10, 110 A.2d 464 (1954); *Rokalor, Inc.* v. *Connecticut Eating Enterprises, Inc.*, 18 Conn. App. 384, 392, 558 A.2d 265 (1989). The trial court correctly concluded that the termination fee clause calls for the payment of a penalty for breach of the contract.

---

[15] Section 4A (ii) of the contract provides that the broker shall be paid a commission: "If, within one hundred twenty (120) days after termination of this Agreement, the Listed Property or any Unit thereof is sold, transferred or otherwise conveyed to any person or entity listed on the Registration List referred to hereinafter, or if a Unit is placed under a purchase agreement executed by such purchaser within said one hundred twenty (120) days, and said purchase agreement is subsequently signed by Owner. Within thirty (30) days following the termination of this Agreement, Broker shall supply Owner with a 'Registration List' enumerating the names of all persons or entities with whom or which Broker has entered into negotiations during the term of this Agreement in an effort to effect a sale, but theretofore has not been consummated . . . ."

Section 10I of the contract provides: "Owner agrees that if, at any time within one year after any termination of this Agreement, Owner employs directly or indirectly, any person who was a broker, Sales Manager, or sales professional of Broker either as an employee or independent contractor of Broker during the term of this Agreement, then Owner will pay Broker one-half (1/2) of the commissions of any Units in the same manner as though this Agreement had remained in force for said one-year period."

[16] Section 8A of the contract provides in pertinent part: "Owner shall indemnify and hold Broker, and Broker's agents, directors, officers, and employees harmless from any claims, lawsuits, or actions, at law or in equity, of any kind or nature whatsoever relating to those claims arising directly or indirectly from Owner's breach of a purchase agreement relating to any Unit, or from any misrepresentation made by Owner and not attributable to Broker, or from any breach by Owner of the terms hereof, or from the violation by Owner of any state or federal laws with respect to prohibition against discrimination, or from the violation by Owner of any legal requirements relating to the sale of Units. Said indemnity shall include reasonable counsel fees and costs of suit. . . . These indemnifications shall survive the termination of this Agreement."

## B

The plaintiff further asserts that the trial court found that § 12B (iii) was a liquidated damage clause and that such finding was contrary to the findings of the attorney trial referee. The trial court did not find that the termination fee provision was a liquidated damage clause and alluded to liquidated damages only by way of observing that: "The report of the attorney trial referee does not contain findings sufficient to satisfy the conditions for an enforceable liquidated damages provision and therefore, the court concludes that the payment of the termination fee constitutes an unenforceable penalty provision."

The conditions that the court mentioned are well known. "It is well settled that a seller may not retain a stipulated sum as liquidated damages and also recover actual damages. . . . It is equally well settled that a contract provision which imposes a penalty for breach of contract is invalid, but a provision which allows liquidated damages for breach of contract is enforceable if certain conditions are satisfied. . . . The requisite three conditions are that: (1) the damage which was to be expected as a result of a breach of contract was uncertain in amount or difficult to prove; (2) there was an intent on the part of the parties to liquidate damages in advance; and (3) the amount stipulated was reasonable." (Citation omitted.) *Hanson Development Co. v. East Great Plains Shopping Center, Inc.,* supra, 195 Conn. 64–65; see also *Norwalk Door Closer Co. v. Eagle Lock & Screw Co.,* 153 Conn. 681, 686, 220 A.2d 263 (1966).

The plaintiff's assertion that the trial court found a liquidated damage clause rests on its claim that the trial court's finding of a penalty was an implicit finding that the parties intended to liquidate damages. As no such

intent was found by the attorney trial referee, the plaintiff claims that such a finding by the trial court was improper.

The flaw in this reasoning is apparent. It was because the attorney trial referee made no finding of an intent to liquidate damages and made no other liquidated damage findings that the trial court refused to find a liquidated damage clause.

## C

"The party seeking to repudiate a clause that fixes a sum as damages has the burden of showing that the agreed sum is so exorbitant as to be in the nature of a penalty." *St. Margaret's-McTernan School, Inc.* v. *Thompson*, 31 Conn. App. 594, 598, 627 A.2d 449 (1993). The plaintiff was allowed a draw against unearned commissions. It actually received the sum of $228,000 although the trial referee found that only $124,120 had been in fact earned. The trial court, while adopting that finding, rejected the attorney trial referee's recommendation that the defendants be reimbursed for the excess draw over commissions earned. That rejection was not made a ground of the defendants' cross appeal. In *Syncsort, Inc.* v. *Indata Services*, 14 Conn. App. 481, 486, 541 A.2d 543, cert. denied, 209 Conn. 804, 548 A.2d 443 (1988), this court stated that "the plaintiff is not seeking recovery for the use of its product but is seeking to impose an unconscionable penalty upon the defendant for its election not to proceed with the contract." A penalty for not proceeding with the contract is precisely what the plaintiff seeks here. The plaintiff's retention of the excess draw over commissions earned plus the award of $13,250 plus interest in the judgment here has fully compensated the plaintiff under the contract. The defendants have carried their burden of showing that the payment of

an additional $50,000 as a termination fee would be nothing more than a penalty.[17]

## D

The plaintiff's final effort to prevail on the termination fee issue is its claim that the clause is actually one for an alternative performance. The plaintiff relies solely on a treatise by Professor Corbin who describes the doctrine as follows: "In an alternative contract the performance of either alternative completely discharges the promisor's duty and entitles him to the performance that was promised in exchange. The payment of damages for breach of a promise never entitles the wrongdoer to the performance promised him in exchange . . . . Where the parties intend the payment to be the agreed price of the privilege of not performing the promise, the language that they employ is very different. . . . In the case of a true alternative contract, the performance of either alternative operates as a *complete discharge* of the promisor's duty and prevents any further remedy against him, direct or indirect. . . . The payment of damages, whether liquidated or unliquidated, never does this." (Emphasis added.) 5 A. Corbin, Contracts (1964) § 1070, pp. 393–97.

The contract provisions that provide for damages in addition to the termination fee vitiate this claim. Payment of the $50,000 fee would not completely discharge the defendants' contractual duties; therefore, the doctrine of alternative performance could not apply here.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[17] We note that the attorney trial referee stated on the record at the conclusion of the evidence: "[The termination fee clause] doesn't necessarily state the claim for liquidated damages but it has the effect of stating a damage amount that in fact has no relevance to any evidence that I've heard."