STATE OF CONNECTICUT *v.* SCOTT WALTON
(14701)

STATE OF CONNECTICUT *v.* AUBREY JOHNSON
(14702)

STATE OF CONNECTICUT *v.* ROBERT WALTON
(14703)

PETERS, C. J., CALLAHAN, BORDEN, BERDON and NORCOTT, Js.

Argued May 5—decision released August 3, 1993

*Neal Cone,* assistant public defender, with whom, on the brief, was *Carolyn M. Jones,* certified legal intern, for the appellants (defendants).

*Marjorie Allen Dauster,* assistant state's attorney, with whom, on the brief, were *John M. Bailey,* state's attorney, and *Paul Murray,* assistant state's attorney, for the appellee (state).

BORDEN, J. The principal issue in these consolidated appeals is the extent to which we should recognize the principle of vicarious liability of a conspirator articulated in *Pinkerton* v. *United States,* 328 U.S. 640, 66 S. Ct. 1180, 90 L. Ed. 1489 (1946). The defendants, Scott Walton, Aubrey Johnson and Robert Walton, appeal[1] from judgments of conviction, after a joint jury trial, of various narcotics offenses. Specifically, Scott Walton appeals from the judgment of conviction of one count of possession of narcotics with intent to sell by a person who is not drug-dependent in violation of General Statutes § 21a-278 (b), and one count of conspiracy to distribute narcotics in violation of General Statutes

---

[1] The defendants appealed from the judgments of the trial court to the Appellate Court, and we transferred the appeals to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c).

§§ 53a-48 (a) and 21a-277 (a).[2] Robert Walton and Aubrey Johnson appeal from judgments of conviction of one count each of conspiracy to distribute narcotics in violation of General Statutes §§ 21a-277 (a) and 53a-48. See footnote 2.

[2] General Statutes § 21a-278 provides: "PENALTY FOR ILLEGAL MANUFAC-TURE, DISTRIBUTION, SALE, PRESCRIPTION OR ADMINISTRATION BY NON-DRUG-DEPENDENT PERSON. (a) Any person who manufactures, distributes, sells, prescribes, dispenses, compounds, transports with the intent to sell or dispense, possesses with the intent to sell or dispense, offers, gives or administers to another person one or more preparations, compounds, mixtures or substances containing an aggregate weight of one ounce or more of heroin, methadone or cocaine or an aggregate weight of one-half gram or more of cocaine in a free-base form or a substance containing five milligrams or more of lysergic acid diethylamide, except as authorized in this chapter, and who is not, at the time of such action, a drug-dependent person, shall be imprisoned for a minimum term of not less than five years nor more than twenty years; and, a maximum term of life imprisonment. The execution of the mandatory minimum sentence imposed by the provisions of this subsection shall not be suspended except the court may suspend the execution of such mandatory minimum sentence if at the time of the commission of the offense (1) such person was under the age of eighteen years or, (2) such person's mental capacity was significantly impaired but not so impaired as to constitute a defense to prosecution.

"(b) Any person who manufactures, distributes, sells, prescribes, dispenses, compounds, transports with the intent to sell or dispense, possesses with the intent to sell or dispense, offers, gives or administers to another person any narcotic substance, hallucinogenic substance other than marijuana, amphetamine-type substance, or one kilogram or more of a cannabis-type substance except as authorized in this chapter, and who is not at the time of such action a drug-dependent person, for a first offense shall be imprisoned not less than five years nor more than twenty years; and for each subsequent offense shall be imprisoned not less than ten years nor more than twenty-five years. The execution of the mandatory minimum sentence imposed by the provisions of this subsection shall not be suspended except the court may suspend the execution of such mandatory minimum sentence if at the time of the commission of the offense (1) such person was under the age of eighteen years or, (2) such person's mental capacity was significantly impaired but not so impaired as to constitute a defense to prosecution."

General Statutes § 53a-48 provides: "CONSPIRACY. RENUNCIATION. (a) A person is guilty of conspiracy when, with intent that conduct constituting

Scott Walton claims that the trial court improperly instructed the jury that he could be convicted of the substantive offense of possession of narcotics with intent to sell by a person who is not drug-dependent on the basis of conduct committed by his coconspirators in furtherance of the conspiracy with which he was charged. All three defendants claim that the trial court improperly: (1) denied their motions for separate trials;

a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one·of them commits an overt act in pursuance of such conspiracy.

"(b) It shall be a defense to a charge of conspiracy that the actor, after conspiring to commit a crime, thwarted the success of the conspiracy, under circumstances manifesting a complete and voluntary renunciation of his criminal purpose."

General Statutes § 21a-277 provides: "PENALTY FOR ILLEGAL MANUFAC-TURE, DISTRIBUTION, SALE, PRESCRIPTION, DISPENSING. (a) Any person who manufactures, distributes, sells, prescribes, dispenses, compounds, trans-ports with the intent to sell or dispense, possesses with the intent to sell or dispense, offers, gives or administers to another person any controlled substance which is a hallucinogenic substance other than marijuana, or a narcotic substance, except as authorized in this chapter, for a first offense, shall be imprisoned not more than fifteen years and may be fined not more than fifty thousand dollars or be both fined and imprisoned; and for a sec-ond offense shall be imprisoned not more than thirty years and may be fined not more than one hundred thousand dollars, or be both fined and impris-oned; and for each subsequent offense, shall be imprisoned not more than thirty years and may be fined not more than two hundred fifty thousand dollars, or be both fined and imprisoned.

"(b) Any person who manufactures, distributes, sells, prescribes, dis-penses, compounds, transports with intent to sell or dispense, possesses with intent to sell or dispense, offers, gives or administers to another per-son any controlled substance, except a narcotic substance, or a hallucino-genic substance other than marijuana, except as authorized in this chapter, may, for the first offense, be fined not more than twenty-five thousand dol-lars or be imprisoned not more than seven years or be both fined and impris-oned; and, for each subsequent offense, may be fined not more than one hundred thousand dollars or be imprisoned not more than fifteen years, or be both fined and imprisoned.

"(c) No person shall knowingly possess drug paraphernalia in a drug fac-tory situation as defined by subdivision (20) of section 21a-240 for the unlaw-ful mixing, compounding or otherwise preparing any controlled substance for purposes of violation of this chapter.

"(d) As an alternative to the sentences specified in subsections (a) and (b) of this section, the court may sentence the person to the custody of the

(2) admitted expert testimony on an ultimate question for the jury; (3) instructed the jury regarding its duties; (4) exercised its discretion by permitting the state to mark certain evidence for identification before it was to be admitted into evidence; (5) instructed the jury regarding the element of possession; and (6) instructed the jury regarding certain prior inconsistent statements made by the state's witnesses. We affirm the judgments.

The jury could reasonably have found the following facts. The defendants were engaged in the trafficking of street drugs, during which the bulk of the drugs was stored in a three-family house located at 284-86 Enfield Street, Hartford. From late September, 1988, through January, 1989, Hartford police department detectives Michael Manzi and Jose Morales conducted a total of approximately fifteen undercover surveillances of the house. During each surveillance, there was a group of young males in front of the house. As a car or pedestrian would stop in front of the house, one of the group would run to the car or person and exchange small packets of street drugs for money. Among this group were the three defendants and a codefendant, Rodney Kelley.[3]

commissioner of correction for an indeterminate term not to exceed three years or the maximum term specified for the offense, whichever is the lesser, and, at any time within such indeterminate term and without regard to any other provision of law regarding minimum term of confinement, the commissioner of correction may release the convicted person so sentenced subject to such conditions as he may impose including, but not limited to, supervision by suitable authority. At any time during such indeterminate term, the commissioner of correction may revoke any such conditional release in his discretion for violation of the conditions imposed and return the convicted person to a correctional institution."

[3] Rodney Kelley was also tried jointly with the three defendants and with two other codefendants, Lenwood Huff, Jr., and Janet Franklin. The trial court granted Huff's and Franklin's motions for judgments of acquittal at the close of the state's case. The jury acquitted Kelley.

Manzi saw Robert Walton on approximately nine of the fifteen surveillance occasions. Robert Walton would give signals to drug customers in cars, such as pointing to his nose or giving a "high five" sign, approach the cars, hand drugs through the windows and take money from the customers. During the surveillances, he approached drug customers and made drug sales approximately thirty-five times.

On approximately twelve occasions, Johnson engaged in the same drug activity as Robert Walton. Scott Walton, who lived on the second floor of the house with his mother, who owned the building, engaged in the same drug activity as Robert Walton and Johnson on approximately twelve occasions. In addition, Scott Walton would follow Kelley, Robert Walton and Johnson to cars to oversee the drug sales. Scott Walton was often on the porch of the house, and went in and out of the front door more often than the other three. Individuals would walk up to Scott Walton on the porch and converse with him, and when they returned to the street, he would enter the house. Neither Lenwood Huff, Jr., nor Janet Franklin; see footnote 3; was observed during any of the surveillances. John T. Kennedy,[4] who was the lessee of the first floor apartment in the house, was present during two or three of the surveillances, but did not engage in any of the drug selling.

The detectives who had conducted surveillances secured a search warrant for the house and, together with approximately ten other detectives, executed the warrant on January 21, 1989. After knocking on, then breaking in, the door, Manzi observed Huff in the kitchen of the first floor apartment holding what appeared to be a firearm. When Huff fled, Manzi and

[4] In a separate proceeding, Kennedy pleaded guilty to and was sentenced for possession of narcotics with intent to sell by a person who is not drug-dependent.

another detective pursued him. Huff was seized, and it was determined that he had been holding a television remote control device. As Manzi pursued Huff, he saw several people in a television room, and Manzi saw Scott Walton place an item underneath a sofa cushion on which Scott Walton was sitting. Manzi also saw someone place something on a coffee table in the middle of the room.

In the television room were the three defendants, Rodney Kelley; see footnote 3; and Franklin and Kenneth Jewell.[5] The sofas and chairs were arranged in a circle around a coffee table, so that all six of the people could reach the coffee table from where they were sitting. On the coffee table was a white, upright, open, plastic shopping bag containing: (1) approximately $2000 in cash; (2) a clear, open, plastic bag containing twelve grams of 84.7 percent pure cocaine, which was in the process of being packaged for distribution; and (3) several one ounce plastic bags containing cocaine. Also on the coffee table were numerous one ounce size plastic bags, the smaller of which weighed between three grams and six and one-half grams, containing 70.8 percent to 79.8 percent pure cocaine. There were forty-three bags of cocaine in all. The street value of the cocaine on the coffee table was approximately $30,000.

The detectives searched the television room and the persons in it. They found a loaded .45 caliber automatic pistol under the cushion where Scott Walton had been sitting. On Johnson's person, the detectives found a paging beeper, which is frequently used to facilitate drug sales over the phone, and $1700 in cash. On Robert Walton, they found two $100 bills; on Scott Walton, $350 in cash; and on Kelley, $200 in cash.

---

[5] Kenneth Jewell ultimately pleaded guilty to possession of narcotics with intent to sell.

The detectives also searched a locked bedroom containing the personal effects of Kennedy. This search yielded a wrapped package of cocaine, weighing almost one kilogram, several guns and $5000 in cash. This cocaine was 83.4 percent pure, and had a street value of approximately $100,000.

I

We first consider Scott Walton's challenge to his conviction of one count of possession of narcotics with intent to sell by a person who is not drug-dependent. He claims that the trial court, by instructing the jury regarding that offense in accordance with the vicarious liability principles of *Pinkerton* v. *United States,* supra, "wrongly expanded the liability of a conspirator, violating state[6] and federal constitutional guarantees of due process[7] and protection from double jeopardy." We disagree.

This claim arises in the following context. In the first count of the information filed against him, the state charged that "at the City of Hartford on or about the 21st day of January, 1989, at approximately 1:15 P.M., at or near the first floor of 286 Enfield Street . . . Scott Walton did possess a narcotics [sic] substance, to wit: cocaine, with the intent to sell, and that the said Scott Walton was not, at that time, a drug dependent person, in violation of Section 21a-278 (b) of the General Statutes."

---

[6] "Although [Scott Walton] purports to rely on both the federal and state constitutions, he has failed to brief or analyze independently any state constitutional provision. Consequently, we limit our discussion to the relevant federal constitutional claim." *Scinto* v. *Stamm,* 224 Conn. 524, 534 n.9, 620 A.2d 99 (1993).

[7] Despite this statement of the nature of his claim, Scott Walton has not indicated in his brief how or why the instruction at issue violated the federal due process clause. We confine our constitutional analysis, therefore, to his argument regarding the federal double jeopardy clause.

In the second count, the state charged Scott Walton with conspiracy to distribute narcotics in violation of General Statutes §§ 21a-277 (a) and 53a-48 (a). This count alleged that "at the City of Hartford, on or about the 1st day of December, 1988, thru [sic] the 21st day of January, 1989 . . . Scott Walton did, with the intent that conduct constituting the crime of DISTRI-BUTION OF NARCOTICS be committed, agree with one or more persons, to wit: John Kennedy, Lenwood Huff, Janet Franklin, Kenneth Jewell, Rodney Kelley, Aubrey Johnson, Robert Walton and others unknown, to engage in and cause the performance of such conduct, and that one or more of the conspirators committed an overt act in pursuance of the conspiracy."

The information listed sixteen overt acts in furtherance of the conspiracy, five of which are relevant here.[8] Those five overt acts were: (1) Scott Walton possessed and assisted in packaging for sale a quantity of cocaine at 286 Enfield Street, first floor, on January 21, 1989; (2) Robert Walton possessed and assisted in packaging for sale a quantity of cocaine at 286 Enfield Street, first floor, on January 21, 1989; (3) Aubrey Johnson possessed and assisted in packaging for sale a quantity of cocaine at 286 Enfield Street, first floor, on January 21, 1989; (4) Kenneth Jewell possessed and assisted in packaging for sale a quantity of cocaine at 286 Enfield Street, first floor, on January 21, 1989; and (5) John Kennedy possessed more than thirty-one ounces of cocaine, with a purity in excess of 80 percent, at 286 Enfield Street, first floor, on January 21, 1989.

---

[8] The other thirteen overt acts involved either: (1) possession of narcotics by Huff and Franklin, whom the trial court acquitted at the end of the state's case; (2) possession of narcotics by Kelley, whom the jury acquitted; or (3) conduct that did not involve possession of narcotics. It is clear, therefore, that these thirteen overt acts could not have been the basis for the imposition of vicarious liability upon Scott Walton. We confine our analysis, therefore, to those overt acts alleged that could have supplied such a basis pursuant to the instructions of the trial court.

The trial court instructed the jury that, even if the state failed to prove beyond a reasonable doubt that Scott Walton had possessed narcotics with the intent to sell, as charged in the first count, he could be convicted under the first count if the jury found "beyond a reasonable doubt: (1) that he was a member of a conspiracy as charged in the second count; (2) that another member of that same conspiracy did possess narcotics with intent to sell at the time and place charged in the first count of the information; and, (3) that that possession was within the scope of the conspiracy[,] in furtherance of its purpose and a foreseeable part of its execution."[9]

---

[9] In its initial charge to the jury, the trial court instructed as follows: "Before I go on to explain the second count of conspiracy to distribute narcotics there is one additional element that I must say about this first count. And I ask you to listen carefully because it gets involved as does the conspiracy count as well. If you should conclude that narcotics were possessed with the intent to sell but that one or more or all of these defendants were not the specific individuals possessing with intent to sell there is an additional step to your deliberation. Each of the defendants is charged in the second count with conspiracy to distribute narcotics. There is a doctrine in our law which provides that once a defendant's participation in a conspiracy is established he is responsible for each of the criminal acts of the other co-conspirators which is within the scope of and in furtherance of the conspiracy. This means in this case that if you conclude that a particular defendant is in fact guilty of conspiracy to distribute narcotics as charged in the second count of the information but that he did not specifically possess narcotics with intent to sell on January 21, 1989, as charged in the first count, then you must determine whether sufficient evidence has been produced to show you, beyond a reasonable doubt, that another member of that same conspiracy did in fact possess narcotics with intent to sell on that date. If such other member of the conspiracy did possess narcotics with intent to sell on January 21, 1989, and if that possession was in the scope of and in furtherance of the conspiracy of which you have concluded, that the particular defendant under consideration was a member, then the defendant would be guilty of the first count. If you conclude that a defendant was a member of a conspiracy as charged in the second count of the information, beyond a reasonable doubt, and that another member of that same conspiracy possessed narcotics with intent to sell, as charged in the first count of the information, on January 21, 1989 at 284-286 Enfield Street either in the room with the television or in the locked bedroom or both; and you further conclude, beyond a reasonable doubt, that this possession

The defendants excepted to this instruction. The jury convicted all three defendants of conspiracy, and also convicted Scott Walton of possession of narcotics with intent to sell by a person who is not drug-dependent.[10]

The trial court's instruction on vicarious criminal liability derives from *Pinkerton* v. *United States,* supra. In that case, the United States Supreme Court held that a conspirator may be held liable for criminal offenses committed by a coconspirator that are within the scope of the conspiracy, are in furtherance of it, and are reasonably foreseeable as a necessary or natural consequence of the conspiracy. Id., 647–48. *Pinkerton* liability is now a recognized part of federal criminal conspiracy jurisprudence. As the Second Circuit Court of Appeals recently stated, *"Pinkerton* is not a broad principle of vicarious liability that imposes criminal responsibility upon every co-conspirator for whatever substantive offenses any of their confederates commit.

---

was within the scope of and in furtherance of this conspiracy then each and every member of that conspiracy would be guilty of the possession charged in the first count whether or not they personally possessed narcotics with intent to sell."

Subsequently, in response to a question from the jury, the trial court gave the following supplemental charge: "With respect to count one—question one, the conviction of a defendant on count two, conspiracy, does not necessarily mean conviction of possession as charged in count one. So if you find that a defendant has not been shown beyond a reasonable doubt to have had possession of narcotics with intent to sell as charged in the first count of the information that defendant would be guilty of the first count only if you find beyond a reasonable doubt: (1) that he was a member of a conspiracy as charged in the second count; (2) that another member of that same conspiracy did possess narcotics with intent to sell at the time and place charged in the first count of the information; and, (3) that that possession was within the scope of the conspiracy in furtherance of its purpose and a forseeable part of its execution."

[10] We cannot determine from the general verdict of the jury whether it convicted Scott Walton of possession of narcotics with intent to sell upon the basis of evidence that he in fact so possessed narcotics or upon the basis of evidence that one of his coconspirators so possessed narcotics. There was evidence to support either theory. For purposes of this claim, however, we will assume that the basis of the jury's verdict was the latter.

On the contrary, in the very decision in which the principle was articulated, co-conspiratory liability was carefully confined to substantive offenses that are (a) committed 'in furtherance of the conspiracy,' and (b) 'reasonably foresee[able]' by the co-conspirator sought to be held responsible 'as a necessary or natural consequence of the unlawful agreement.' [*Pinkerton* v. *United States,* supra]." *United States* v. *Jordan,* 927 F.2d 53, 56 (2d Cir.), cert. denied, 501 U.S. 1210, 111 S. Ct. 2811, 115 L. Ed. 2d 983 (1991); *United States* v. *Luis-Gonzales,* 719 F.2d 1539, 1545 n.4 (11th Cir. 1983) ("[a] conspirator may be found guilty of the substantive act of possession committed by a coconspirator in furtherance of the conspiracy so long as the coconspirator's acts are within the reasonably foreseeable scope of the conspiracy").

*Pinkerton* liability has also been adopted by the majority of state jurisdictions that have considered the issue. See, e.g., *Pendleton* v. *State,* 57 Ala. App. 454, 329 So. 2d 145 (1976); *Johnson* v. *State,* 252 Ark. 1113, 482 S.W.2d 600 (1972); *State* v. *Tyler,* 251 Kan. 615, 840 P.2d 413 (1992); *Norman* v. *State,* 381 So. 2d 1024 (Miss. 1980); *State* v. *Stein,* 70 N.J. 369, 360 A.2d 347 (1976); *Commonwealth* v. *Roux,* 465 Pa. 482, 350 A.2d 867 (1976); *State* v. *Barton,* 424 A.2d 1033 (R.I. 1981); but see, e.g., *State ex rel. Woods* v. *Cohen,* 173 Ariz. 497, 844 P.2d 1147 (1992); *Commonwealth* v. *Stasiun,* 349 Mass. 38, 206 N.E.2d 672 (1965); *People* v. *McGee,* 49 N.Y.2d 48, 399 N.E.2d 1177, 424 N.Y.S.2d 157, cert. denied sub nom. *Quamina* v. *New York,* 446 U.S. 942, 100 S. Ct. 2166, 64 L. Ed. 2d 797 (1979); *State* v. *Small,* 301 N.C. 407, 272 S.E.2d 128 (1980).

We note initially that the question of whether *Pinkerton* liability should be recognized in this state is not foreclosed by our penal code. Although the *Pinkerton* principle does not appear in haec verba in the penal code, that lacuna is not determinative in this case,

because § 53a-4 of the code provides: "The provisions of this chapter shall not be construed as precluding any court from recognizing other principles of criminal liability or other defenses not inconsistent with such provisions." The official commentary to that provision states: "The purpose of this savings clause is to make clear that the provisions of sections 53a-5 to 53a-23, which define the principles of criminal liability and defenses, are not necessarily exclusive. A court is not precluded by sections 53a-5 to 53a-23 from recognizing other such principles and defenses not inconsistent therewith."[11] Commission to Revise the Criminal Statutes, Penal Code Comments, Conn. Gen. Stat. Ann. (West 1985) § 53a-4, p. 196.

We do not believe that the *Pinkerton* principle is inconsistent with any other principle of criminal liability stated in the code. The issue, therefore, is whether the principle should be recognized as a matter of policy under the circumstances of this case. We conclude that the principles of *Pinkerton* appropriately apply under the facts of this case, in which: (1) the evidence indi-

---

[11] This savings clause, moreover, distinguishes the cases of *State ex rel. Woods* v. *Cohen,* 173 Ariz. 497, 844 P.2d 1147 (1992), and *People* v. *McGee,* 49 N.Y.2d 48, 399 N.E.2d 1177, 424 N.Y.S.2d 157, cert. denied sub nom. *Quamina* v. *New York,* 446 U.S. 942, 100 S. Ct. 2166, 64 L. Ed. 2d 797 (1980), upon which the defendant relies. The court's analysis in *State ex rel. Woods* v. *Cohen,* supra, 449–501, rested wholly upon the absence from Arizona's criminal statutes of any statutory basis for *Pinkerton* liability and on a specific rejection of it in the commentary by the Arizona Criminal Code Commission. Similarly, the court's analysis in *People* v. *McGee,* supra, 57, rested in part on the absence of conspiratorial liability from the New York penal law provisions regarding "conduct that will render a person criminally responsible for the act of another." Unlike our penal code, however, neither the Arizona criminal statutes nor the New York penal law contains a savings clause comparable to General Statutes § 53a-4.

Moreover, contrary to the assertion of the dissent, we do not fashion an additional substantive offense by applying *Pinkerton* to the facts of this case. The *Pinkerton* principle does not create a substantive offense; it applies a particular principle of vicarious criminal liability to an appropriate case. This is consistent with both the letter of and the commentary to § 53a-4.

cates that Scott Walton was directing and controlling the drug selling and distributing operation; (2) the offense for which Scott Walton was vicariously held liable was a principal object of the conspiracy; and (3) that offense was proven by one or more of the overt acts alleged in support of the charge of conspiracy.[12] Several considerations lead us to this conclusion.

First, the rationale of *Pinkerton* liability applies in the circumstances of this case. That rationale is essentially that, because the conspirator played a necessary part in setting in motion a discrete course of criminal conduct, he should be held responsible, within appropriate limits, for the crimes committed as a natural and probable result of that course of conduct. "A conspiracy is a partnership in crime." *Pinkerton* v. *United States,* supra, 644. Each such partner "instigated the commission of the crime," and "[t]he unlawful agreement contemplated precisely what was done. It was formed for the purpose. The act was done in execution of the enterprise. The rule which holds responsible one who counsels, procures, or commands another to commit a crime is founded on the same principle. That principle is recognized in the law of conspiracy when the overt act of one partner in crime is attributable to all. An overt act is an essential ingredient of the crime of conspiracy . . . . If that can be supplied by the act of one conspirator, we fail to see why the same or other acts in furtherance of the conspiracy are likewise not attributable to the others for the purpose of holding them responsible for the substantive offense." Id., 647. We endorse this rationale, at least as applied to the facts of the present case.

In particular, this rationale applies to Scott Walton's conviction for possession of narcotics with intent to sell.

---

[12] We need not decide at this time whether *Pinkerton* liability would apply in other circumstances.

If he could reasonably be found to have been a leader of the conspirators who agreed to distribute narcotics between December 1, 1988, and January 21, 1989, he should be held responsible for the possession of narcotics with intent to sell on January 21, 1989. He, together with the other conspirators, would have set in motion the course of criminal conduct that led to the specific result of the crime of possession of narcotics with intent to sell.

In this case, the state presented evidence from which the jury could have reasonably found that Scott Walton directed and controlled the criminal operation. Specifically, the evidence tended to demonstrate that Scott Walton, who lived in the building that was the center of the operation, oversaw the operation from his post on the front porch of the house, and was armed while sitting in the television room in which cash and large amounts of cocaine were seized.

Second, the offense of possession of narcotics with intent to sell was a principal object of the conspiracy charged. The conspiracy count charged Scott Walton with conspiracy to distribute narcotics in Hartford, between December 1, 1988, and January 21, 1989. The possession count charged Scott Walton with possession with intent to sell, on Enfield Street in Hartford, on January 21, 1989. The evidence of the conspiracy, which included the surveillance of that defendant between December 1, 1988, and January 21, 1989, indicated that the conspiracy culminated in the events of January 21, 1989.

Moreover, in this case, one or more of the overt acts alleged in support of the conspiracy constituted the proof of the possession count. In order for the jury to convict Scott Walton of the crime of possession of narcotics with intent to sell by a person who is not drug-dependent, it had to find that either he, Robert Wal-

ton, Aubrey Johnson, Kenneth Jewell or John Kennedy possessed cocaine with the intent to sell it, at 286 Enfield Street on January 21, 1989. These were among the overt acts alleged in support of the conspiracy, and the evidence supporting these provided the only bases for a conviction of Scott Walton of the possession charge.

Third, holding Scott Walton vicariously liable under the circumstances of this case is consistent with holding him liable for conspiracy by virtue of an overt act committed by a coconspirator. At least if, as in this case, the substantive offense was a principal object of the conspiracy and was proven by one of the overt acts alleged, the rationale of the court in *Pinkerton* is apt: "An overt act is an essential ingredient of the crime of conspiracy . . . . If that can be supplied by the act of one conspirator, we fail to see why the same . . . [act] in furtherance of the conspiracy [is] likewise not attributable to the others for the purpose of holding them responsible for the substantive offense." Id., 647.

Fourth, although this court[13] has never specifically considered the *Pinkerton* principle in the context of a conspiracy case, the principle has roots in our state jurisprudence. In *State* v. *Parham,* 174 Conn. 500, 391 A.2d 148 (1978), the defendant was charged with and convicted of burglary in the first degree in violation of General Statutes § 53a-101 (a) (2),[14] and unlawful restraint in the first degree in violation of General Stat-

---

[13] In *State* v. *Failla,* 1 Conn. App. 524, 528, 473 A.2d 1233 (1984), the Appellate Court applied *Pinkerton* in the course of affirming a conviction for bribery as the underlying offense of the conspiracy in which the defendant had been engaged.

[14] General Statutes § 53a-101 provides: "BURGLARY IN THE FIRST DEGREE: CLASS B FELONY. (a) A person is guilty of burglary in the first degree when he enters or remains unlawfully in a building with intent to commit a crime therein and: (1) He is armed with explosives or a deadly weapon or dangerous instrument, or (2) in the course of committing the offense, he inten-

utes § 53a-95 (a).[15] The evidence in *Parham* demon-
strated that the defendant and another man had
entered the victim's garage, where they grabbed her
and threw a shirt over her head. Id., 502. A struggle
ensued, during which she was able to remove the shirt
briefly and glance at one of the men. Id. After pulling
the shirt back over her head, tying her up, and throw-
ing her to the garage floor, causing her injury, the two
men stole property from the house. Id. The victim iden-
tified the defendant as "one of the two men" who had
grabbed her in the garage. Id., 503.

In order to convict the defendant of the crime of bur-
glary in the first degree, the state was required to prove
that, in the course of committing the burglary, the
defendant had "intentionally, knowingly or recklessly
inflict[ed] or attempt[ed] to inflict bodily injury on" the
victim. Id., 506 n.1. The trial court instructed the jury
that "when more than one person participates in a bur-
glary in the course of which one participant commits
an act which raises the offense to the more serious
crime of burglary in the first degree by 'intentionally,
knowingly or recklessly' inflicting or attempting to
inflict bodily injury on anyone, *each participant in the
burglary is guilty of the aggravated offense and it is
without significance that such other participant was
without knowledge of the other's conduct which caused*

tionally, knowingly or recklessly inflicts or attempts to inflict bodily injury
on anyone.

"(b) An act shall be deemed 'in the course of committing' the offense if
it occurs in an attempt to commit the offense or flight after the attempt
or commission.

"(c) Burglary in the first degree is a class B felony provided any person
found guilty under subdivision (1) of subsection (a) shall be sentenced to
a term of imprisonment of which five years of the sentence imposed may
not be suspended or reduced by the court."

[15] General Statutes § 53a-95 provides: "UNLAWFUL RESTRAINT IN THE
FIRST DEGREE: CLASS D FELONY. (a) A person is guilty of unlawful restraint
in the first degree when he restrains another person under circumstances
which expose such other person to a substantial risk of physical injury."

*the physical injury or that he himself had no intention to cause such injury."* (Emphasis added.) Id., 506–507. The defendant objected to this instruction, arguing that the state was required to prove that the defendant, rather than an accomplice or coparticipant, inflicted or attempted to inflict the injury. Id., 507.

On appeal, this court found no error in the trial court's instruction. Id. Although the principal rationale of the court was based upon the principles of accessory liability under General Statutes § 53a-8; see id., 507–508; the court rejected the defendant's claim which was "predicated upon 'accepted principles of statutory construction.' " Id., 507. In rejecting the claim, this court noted its treatment of a somewhat similar claim in *State* v. *Cots,* 126 Conn. 48, 59, 9 A.2d 138 (1939): *"The answer to it depends rather upon the principles of the law of criminal conspiracy than of statutory construction."* (Emphasis added.)

Moreover, the passage from *State* v. *Cots,* supra, 59, to which the court referred in *Parham* is as follows: "In so far as the guilt of Cots is concerned, the controlling question is not whether Weaver's malice and premeditation are imputable to him under the statutes, but rather whether the existence of the conspiracy for the original felony renders him responsible for the natural and probable results of the execution of that original felony. The universally accepted rule is: All who join in a common design to commit an unlawful act, the natural and probable consequence of the execution of which involves the contingency of taking human life, are responsible for a homicide committed by one of them while acting in pursuance of, or in furtherance of, the common design." (Internal quotation marks omitted.)

This application of the *Pinkerton* principle to a homicide committed in furtherance of a conspiracy has long

been part of our jurisprudence. See, e.g., *State* v. *Young,* 191 Conn. 636, 642, 469 A.2d 1189 (1983); *State* v. *McCarthy,* 133 Conn. 171, 173, 49 A.2d 594 (1946); *State* v. *Rossi,* 132 Conn. 39, 44, 42 A.2d 354 (1945). The language of *State* v. *Parham,* supra, quoted above, indicates this court's willingness, in an appropriate case, to extend it to other crimes committed in furtherance of a conspiracy.

Some commentators have criticized the *Pinkerton* principle. See, e.g., 2 W. LaFave & A. Scott, Substantive Criminal Law (1986) § 6.8 (a); note, "Vicarious Liability For Criminal Offenses of Co-Conspirators," 56 Yale L.J. 371 (1947). The principal basis of that criticism is that " 'law would lose all sense of just proportion' if one might, by virtue of his one crime of conspiracy, be 'held accountable for thousands of additional offenses of which he was completely unaware and which he did not influence at all.' " 1 W. LaFave & A. Scott, supra, p. 155, quoting Model Penal Code § 2.06, comment, p. 307 (1985). In an appropriate case, that criticism might well be valid. We do not believe, however, that it applies to this case, in which we have applied the *Pinkerton* principle to a situation in which the jury reasonably could have found that Scott Walton was in control of the operation, the crime was a principal object of the conspiracy, and the crime was one of the overt acts alleged as part of the conspiracy.[16]

[16] Indeed, even Professors LaFave and Scott acknowledge that, with respect to an extensive narcotics ring, *Pinkerton* liability "might be justified for those who are at the top and directing and controlling the entire operation, but it is clearly inappropriate to visit the same results upon the lesser participants in the conspiracy." 1 W. LaFave & A. Scott, Substantive Criminal Law (1986) p. 155. We note in this connection that the fear expressed by LaFave and Scott, namely, that "[e]ach retailer in an extensive narcotics ring could be held accountable as an accomplice to every sale of narcotics made by every other retailer in that vast conspiracy"; id.; did not materialize in this case. Although the *Pinkerton* instruction was given regarding all the defendants, the jury only applied the principle to Scott Walton.

Scott Walton argues that recognizing the *Pinkerton* principle would be contrary to the scheme of our penal code because "[t]he fact that the General Assembly enacted separate statutes for accessory liability and for conspiracy clearly means that they are not to be collapsed into one." We disagree.

Recognition of the *Pinkerton* principle in an appropriate case is not inconsistent with the notion of accessory liability, and does not mean, as the defendant argues, that the two are "collapsed into one." "Aiding and abetting has a broader application [than does *Pinkerton* liability]. It makes a defendant a principal when he consciously shares in any criminal act whether or not there is a conspiracy. And if a conspiracy is also charged, it makes no difference so far as aiding and abetting is concerned whether the substantive offense is done pursuant to the conspiracy. *Pinkerton* v. *United States,* [supra,] is narrow in its scope. Aiding and abetting rests on a broader base; it states a rule of criminal responsibility for acts which one assists another in performing. The fact that a particular case might conceivably be submitted to the jury on either theory is irrelevant. It is sufficient if the proof adduced and the basis on which it was submitted were sufficient to support the verdict." *Nye & Nissen* v. *United States,* 336 U.S. 613, 620, 69 S. Ct. 766, 93 L. Ed. 2d 919 (1949).

Scott Walton also argues that application of the *Pinkerton* principle to him in this case violates his federal double jeopardy right; see footnote 7; not to be punished twice for the same offense in the same trial.[17] This argument is without merit.

---

[17] Because this claim was not raised at trial, in order to prevail Scott Walton must satisfy all four of the requirements set forth in *State* v. *Golding,* 213 Conn. 233, 239–40, 567 A.2d 823 (1989). As the analysis in the text indicates, we conclude that Scott Walton has failed to satisfy the third requirement, namely, that the alleged constitutional violation exists and deprived him of a fair trial.

Because the relevant overt acts alleged in support of the conspiracy charge formed the potential basis for the conviction of possession with intent to sell, we assume that the two offenses—conspiracy and possession with intent to sell—arose out of the same transaction for purposes of double jeopardy analysis. The question, therefore, is whether, under the test set forth in *Blockburger* v. *United States,* 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932), " 'each crime contains an element not found in the other.' . . . We determine whether each crime contains an element not found in the other by examining only the relevant statute, the information and the bill of particulars, and not the evidence presented at trial." *State* v. *Tweedy,* 219 Conn. 489, 495, 594 A.2d 906 (1991).

Under this test, the two offenses are not the " 'same offense for double jeopardy purposes . . . .' " Id. Guilt of possession under the first count required proof of the completed offense of possession by Scott Walton, on January 21, 1989, with intent to sell. Guilt of conspiracy under the second count could have been established by proof of possession by any of the other alleged coconspirators, on that date, and did not require proof of possession by Scott Walton. Moreover, guilt of conspiracy under the second count required proof of an agreement, which was not an element of proof under the first count.

It does not change the double jeopardy analysis that Scott Walton could have been convicted of possession with intent to sell, under the first count pursuant to the trial court's *Pinkerton* instructions, by virtue of possession by one of his coconspirators. "[T]he plea of double jeopardy is no defense to a conviction for both offenses." *Pinkerton* v. *United States,* supra, 643. "That the substantive conviction was obtained through a *Pinkerton* instruction is irrelevant. Rather, the focus must be on the offenses and whether each offense

requires proof of a fact that the other does not." *United States* v. *Cerone,* 830 F.2d 938, 944 (8th Cir. 1987), cert. denied sub nom. *Aiuppa* v. *United States,* 486 U.S. 1006, 108 S. Ct. 1730, 100 L. Ed. 2d 194 (1988); *United States* v. *Saavedra,* 684 F.2d 1293, 1301 (9th Cir. 1982). In light of this well established double jeopardy law, we reject Scott Walton's claim.

## II

We next consider the claim by all the defendants that the trial court improperly denied their motions to sever their trials, both before and during the trial. They claim that the denial of their motions for separate trials resulted in substantial prejudice to them because their defenses were antagonistic in that defendants Huff and Franklin sought to bolster the credibility of officers Manzi and Morales, while the other defendants sought to impeach their credibility. We reject this claim.

We first must clear away the underbrush of what is not before us in this appeal. Despite the defendants' apparent references to the denial of certain of their pretrial motions for severance, this case does not present any such issue. The only pretrial motions for severance that the defendants have brought to our attention are: (1) a written motion by Scott Walton, which none of the other defendants joined, for a separate trial based upon certain anticipated evidence that never materialized and that has not been revisited on appeal; and (2) a written motion by Janet Franklin, which all of the defendants on appeal joined, but which was based solely on the argument that the state had never moved for joint trials pursuant to Practice Book § 829[18]—an argument that has similarly not been renewed on appeal.

[18] Practice Book § 829 provides: "TRIAL TOGETHER OF INDICTMENTS OR INFORMATIONS

"The judicial authority may, upon his own motion or the motion of any party, order that two or more indictments or informations or both, whether against the same defendant or different defendants, be tried together."

Furthermore, Aubrey Johnson never made or joined any midtrial motions for separate trials. For purposes of this appeal, only Scott Walton and Robert Walton made such motions.[19] We consider, therefore, only the denial of Scott Walton's midtrial motion, which Robert Walton joined, for severance of their trial from that of Janet Franklin and Lenwood Huff.[20]

The gist of the claim of the Waltons is that their defenses were antagonistic to those of Huff and Frank-

[19] Janet Franklin also moved for a severance during the trial, but the denial of that motion is not before us because the trial court rendered a judgment of acquittal as to her at the end of the state's case.

[20] We reject the claim of Aubrey Johnson that he is entitled to adopt the appellate claim of Scott Walton and Robert Walton regarding the denial of their motions. The transcript indicates that, if Johnson had desired to join in a motion of a codefendant, he knew how to make that wish known, as he did by joining Janet Franklin's pretrial motion for severance based upon Practice Book § 829. We presume that his silence in the face of a similar midtrial motion by Robert Walton, specifically joined by Scott Walton, was for tactical or other reasons he deemed to be valid. For example, he may well have believed that the potential prejudice advanced by the Waltons was not as great as they believed it to be, that the state's case was not going to get weaker and his defense was not going to get stronger with time, and that, the jury having been selected and the trial under way, he would just as soon take his chances with the jury that had been empaneled.

Johnson's attempt to bring his claim under the mantle of *State* v. *Golding,* 213 Conn. 233, 567 A.2d 823 (1989), is unavailing. Under the circumstances of this case, we can see nothing constitutional about the issue of whether the trial court abused its discretion in denying the severance motions. "Patently nonconstitutional claims that are unpreserved at trial do not warrant special consideration simply because they bear a constitutional label." Id., 240.

Similarly, Johnson's reliance on *State* v. *Pelletier,* 196 Conn. 32, 34, 490 A.2d 515 (1985), is not persuasive. That case does not stand for the proposition that whenever a codefendant makes a trial motion in which the defendant did not join, the silent defendant may raise the denial of the motion in his appeal. In that case, the codefendant had already succeeded on appeal in challenging the validity of the conviction, and it would have been anomalous to treat the defendant differently. Furthermore, in that case, unlike this case, it would have been anomalous for the trial court to have granted a mistrial in favor of the codefendant based upon the inflammatory final argument of the state's attorney, without having entered the same order in favor of the defendant.

lin because Huff and Franklin sought to bolster the credibility of detectives Manzi and Morales, whereas the Waltons sought to undermine the credibility of these witnesses. This claim is without merit.

"Whether to consolidate or sever the trials of defendants involved in the same criminal incident lies within the sound discretion of the trial court. *State* v. *Vinal,* 198 Conn. 644, 649, 504 A.2d 1364 (1986); *State* v. *King,* 187 Conn. 292, 302, 445 A.2d 901 (1982); *State* v. *Holup,* 167 Conn. 240, 244, 355 A.2d 119 (1974); see Practice Book § 829. Ordinarily justice is better subserved where the parties are tried together. *State* v. *Holup,* supra, 244. Joint trials of persons jointly indicted or informed against are the rule, and separate trials the exception resting in the discretion of the court. *State* v. *Castelli,* 92 Conn. 58, 65, 101 A. 476 [1917] . . . . A separate trial will be ordered where the defenses of the accused are antagonistic, or evidence will be introduced against one which will not be admissible against others, and it clearly appears that a joint trial will probably be prejudicial to the rights of one or more of the accused. The test for the trial court is whether substantial injustice is likely to result unless a separate trial be accorded. *State* v. *Varricchio,* 176 Conn. 445, 447–48, 408 A.2d 239 (1979). [T]he phrase prejudicial to the rights of the parties means something more than that a joint trial will probably be less advantageous to the accused than separate trials. *State* v. *McCarthy,* 130 Conn. 101, 103, 31 A.2d 921 (1943). In the determination of whether substantial injustice is likely to result from a joint trial or whether such injustice has in fact resulted, an important factor to consider is whether the defenses of the codefendant[s] are incompatible and completely antagonistic to each other. *State* v. *Gordon,* 170 Conn. 189, 190, 365 A.2d 1056 (1976); *State* v. *Holup,* [supra, 246]. *State* v. *Haskins,* 188 Conn. 432, 449–50, 450 A.2d 828 (1982). The discretion of the court

is necessarily exercised before the trial begins and with reference to the situation as it then appears to the court. *State* v. *Carbone,* 172 Conn. 242, 259, 374 A.2d 215 (1977), cert. denied, 431 U.S. 967, 97 S. Ct. 2925, 53 L. Ed. 2d 1063 (1977); *State* v. *Hart,* 169 Conn. 428, 436, 363 A.2d 80 (1975); *State* v. *Holup,* supra, 244–45." (Internal quotation marks omitted.) *State* v. *Smith,* 201 Conn. 659, 668–69, 519 A.2d 26 (1986).

The trial court did not abuse its discretion by denying the motion to sever. We have fully examined the entire trial transcript, and are convinced that the defenses of Scott and Robert Walton were not antagonistic to those of Huff and Franklin. Contrary to the assertion of the Waltons, Huff and Franklin's defense was not that they were innocent because the Waltons were guilty, or that in order to acquit Huff and Franklin the jury should believe Manzi and Morales and thus convict the Waltons.

The defense of Huff and Franklin, as gleaned from their cross-examination of the state's witnesses, was that, regardless of what the jury believed regarding the Waltons, Huff and Franklin were innocent because they had not been the subject of the presearch surveillance and, as to Huff, he had been found in the kitchen rather than the television room. The defense of Scott Walton[21] was that: (1) regarding the surveillance of the

[21] Scott Walton's defense, as brought into focus by his final argument to the jury, was made through his cross-examination of the state's witnesses, and through introduction of the following witnesses. His mother and Lenwood Huff, Jr., testified that: Huff had been summoned to the building to repair the oil burner; Scott Walton accompanied Huff to the basement for that purpose, and only entered the apartment when, after the job was done, he accompanied Huff, who was waiting to be paid by John T. Kennedy, the occupant of the apartment. Kennedy, who was serving a sentence for possession of narcotics with intent to sell by a person who is not drug-dependent, testified that: he occupied the apartment in question; Huff had come to the apartment to repair the oil burner; Kennedy's apartment had been the center of his drug operation pursuant to which he would pick up,

street drug activity, the observations of Manzi and Morales should not be believed; and (2) regarding the events of January 21, 1989, Scott Walton was present in the apartment only because he had accompanied Huff, who had been summoned to the building to repair the oil burner, and the state had not proven that he was in possession of the narcotics found in the apartment. The defense of Robert Walton[22] was that the state's evidence was simply too weak for it to sustain its burden of proof, and that there were several bases for reasonable doubt that the state had not overcome. Furthermore, because the trial court rendered a judgment acquitting Huff and Franklin at the end of the state's case, there was not even an occasion for them to introduce evidence or to make a final argument to the jury that could have tended to harm the Waltons. In sum, although Huff and Franklin "may have adopted different trial strategies [from that of Scott and Robert Walton]"; *State* v. *Haskins,* supra, 450; those strategies were not "incompatible and completely antagonistic" to those of the Waltons. *State* v. *Smith,* supra, 669.

## III

The defendants next claim that the trial court improperly permitted Manzi to testify, over their objections and exceptions, to an ultimate fact contrary to the principle that we articulated in *State* v. *Vilalastra,* 207

store and deliver cocaine as an agent for others; the cocaine in the apartment was part of his operation and not the defendants'; and the three other defendants—Johnson, Kelly and Robert Walton—who were ordinarily too busy playing basketball in the neighborhood to be involved in the sale of drugs, had come to the apartment to watch a basketball game on his large screen television set shortly before he had left the apartment. Scott Walton also introduced a transcript of the plea proceedings of Kenneth Jewell, one of the persons in the television room at the time of the arrest and search, who had pleaded guilty to possession of narcotics with intent to sell.

[22] Robert Walton did not introduce any evidence. We glean his defense from his cross-examination of the state's witnesses and from his final argument to the jury.

Conn. 35, 540 A.2d 42 (1988). We agree, but conclude that the defendants have failed to establish that the admission of this testimony requires reversal of the convictions.

The state asked Manzi: "Based on all of [your] training and experience, you observed what was on that table, how it was packaged, what was open, what was closed. Did you, based on all that training and experience, come to a conclusion as what had transpired to get those to the way they were?" Manzi answered: "The white powder in the large white plastic bag was in the process of being packaged for distribution."

In *Vilalastra,* the defendant was charged with possession of cocaine with intent to sell. At trial, the state asked its expert witness: "Would you [be] able to formulate an opinion based on your training and experience and the facts as I gave you, whether or not the items found . . . were possessed for either personal use and consumption or with the intent to sell and or dispense?" Id., 39. Over the defendant's objection, the trial court permitted the witness to testify: "My opinion is that this would be used for sale, not personal use." Id.

On appeal in *Vilalastra,* we concluded that the evidence had been improperly admitted, because it went beyond permitting the witness "to testify . . . that a certain pattern of conduct is often found in narcotics cases, leaving it for the jury to determine whether the defendant's conduct fits the pattern," and permitted the witness to testify "that such conduct fitted that pattern, at least when other inferences could have been drawn not unreasonably although perhaps not as reasonably as that to which the expert testified." (Internal quotation marks omitted.) Id., 44.

We stated that "a trial court should have broad discretion in the matter of the admission of expert testi-

mony concerning the sale of illicit drugs. . . . Expert witnesses may testify that certain behavior by a defendant or his possession of particular items is conduct similar to that engaged in by the typical drug dealer. *United States* v. *Brown,* [776 F.2d 397, 400–402 (2d Cir. 1985), cert. denied, 475 U.S. 1141, 106 S. Ct. 1793, 90 L. Ed. 2d 339 (1986)]. A police officer, who is qualified as an expert witness, may even testify that, in light of the officer's personal observations of his conduct, it appeared that a defendant was engaged in narcotics sales. *United States* v. *Young,* 745 F.2d 733, 760–61 (2d Cir. 1984), cert. denied sub nom. *Myers* v. *United States,* 470 U.S. 1084, 105 S. Ct. 1842, 85 L. Ed. 2d 142 (1985); *United States* v. *Carson,* [702 F.2d 351, 369–70 (2d Cir.), cert. denied sub nom. *Mont* v. *United States,* 462 U.S. 1108, 103 S. Ct. 2465, 77 L. Ed. 2d 1335 (1983)]. . . .

"We hold, however, that the state may not ask an expert witness whether in his expert opinion a defendant possessed illegal drugs for sale or consumption. We note that it would have been entirely proper for the state's attorney to have asked [the detective] whether in his expert opinion drug sellers usually work with the items found and seized in the defendant's apartment, or whether it would be unusual to discover these items in the apartment of someone who did not sell drugs. *State* v. *Girolamo,* 197 Conn. 201, 213, 496 A.2d 948 (1985); *State* v. *Williams,* [169 Conn. 322, 334, 363 A.2d 72 (1975)]; *State* v. *Grayton,* [163 Conn. 104, 302 A.2d 246, cert. denied, 409 U.S. 1045, 93 S. Ct. 542, 34 L. Ed. 2d 495 (1972)]." *State* v. *Vilalastra,* supra, 45.

We can perceive no difference between the question and answer in this case and those in *Vilalastra.* In this case, the defendants were charged, in the second count, with conspiracy to distribute narcotics. Thus, whether the narcotics were being readied for distribution was an ultimate question for the jury.

The question in issue did not ask the witness to testify, for example, whether, in his opinion, drug distributors usually package drugs in containers like those found in the television room, or whether it would be unusual to discover those packages in the possession of someone who did not distribute drugs. Cf. *State* v. *Vilalastra,* supra. Thus, it did not ask whether a certain pattern of conduct is often found in drug distribution cases, leaving to the jury to determine whether the defendants' conduct fit that pattern. Rather, in effect it asked whether, and Manzi testified that, the conduct of these defendants fit such a pattern. This was improper under *Vilalastra.*

As in *Vilalastra,* however, this ruling of the trial court was evidentiary, rather than constitutional, in dimension, and the defendants have not established that it is more probable than not that the improper ruling affected the verdict. Id., 47. Thus, the error was harmless.

There was overwhelming evidence that the cocaine found in the television room was there for the purposes of distribution, rather than for personal consumption. In the shopping bag were $2000 in cash, twelve grams of 84.7 percent pure cocaine, and several one ounce plastic bags of cocaine. On the coffee table were forty-three plastic bags containing cocaine of purity ranging from 70.8 to 79.9 percent. The street value of the cocaine on the coffee table was approximately $30,000. In addition, this evidence cannot be viewed in isolation, but must be viewed in connection with the contents of the bedroom. The bedroom contained several guns, $5000 in cash, and a wrapped, one kilogram package of cocaine of 83.4 percent purity with a street value of $100,000. Indeed, the testimony of Kennedy, introduced by Scott Walton, suggested that the cocaine found in his apartment was part of his drug distribution operation. See footnote 21. Finally, Scott Walton

explicitly conceded in his final argument to the jury, without any objection by the other defendants, that, considering their quantity, the drugs found in the apartment were not for personal consumption. The clear inference from this concession is that they were for distribution.

## IV

The defendants next claim that certain instructions to the jury[23] regarding its duty violated their constitutional rights[24] because they: (1) were unfairly slanted in favor of conviction by conveying to the jury the court's belief that the jury's responsibilities would be better served by conviction; and (2) undermined the presumption of innocence and diluted the state's burden of proof. Because no exception was taken to the instructions at trial, the defendants seek to prevail under *State* v. *Golding*, supra. We conclude that the defendants' claim is unavailing.

[23] The defendants challenge the following instruction to the jury: "You have to objectively consider the evidence with your minds unswerved from your duty by any kind of emotion or sentiment and determine your verdicts on careful consideration of the facts disclosed by the evidence and the application of the law. Each of these defendants justly relies upon you to evaluate carefully all of the evidence and to render verdicts of not guilty if the facts and the law require such verdicts. The state of Connecticut, on the other hand, looks to you as sworn officers of the court to deal with the case fairly, firmly and honestly as strong minded men and women and with the interest placed in your hands as an arm of the court to aid and uphold the law of the land by rendering a verdict of guilty if the facts and the law require such a verdict. It is the sworn duty of the courts and jurors to safeguard the rights of persons charged with crimes by respecting the presumption of innocence which the law imputes to every person so charged. And by making the state meet its burden of proving guilt beyond a reasonable doubt. But you must keep in mind that those rules of law are made to protect the innocent and not the guilty."

[24] The defendants purport to rely on both the federal due process clause and article first, § 8, of the Connecticut constitution. In the absence of any independent analysis of the Connecticut constitution, we consider the defendants' claims only under the due process clause of the United States constitution. See *Scinto* v. *Stamm,* 224 Conn. 524, 534 n.9, 620 A.2d 99 (1993).

## A

The defendants' claim that the court's charge was unfairly slanted in favor of conviction is based upon the following language: "The state of Connecticut . . . looks to you as sworn officers of the court to deal with this case fairly, firmly and honestly as strong minded men and women and with the interest placed in your hands as an arm of the court to aid and uphold the law of the land by rendering a verdict of guilty if the facts and the law require such a verdict." The defendants argue that the "jurors were thus given an image of their being strong minded and mentally tough or firm *not* when looking at resisting a conviction because guilt had not been proven beyond a reasonable doubt, even though they might have believed a defendant was probably guilty, but rather, were invited to use their mental toughness in deciding to convict. And they were not hailed as acting as 'officers of this Court,' acting 'as an arm of the court to aid and uphold the law of the land' when told of their duties in considering [the] defendants' claims, but rather when told of looking towards convicting and away from acquitting. This was unfairly prejudicial. Such language implied that the jurors would be shirking their responsibility if they voted to acquit." (Emphasis in original.)

We agree with the defendants that jurors are no less "officers of the court" and act no less as an "arm of the court" if they vote to acquit rather than to convict. We also agree that, if they vote to acquit because the state has not established guilt beyond a reasonable doubt, they are "upholding the law of the land" no less than if they vote to convict. In short, it would be preferable for a trial court either to omit those references entirely or to frame the instructions so that the laudatory references are included with respect to both jury functions—acquittal as well as conviction. That does

not mean, however, that the defendants are correct in their characterization of the message the language in issue may have conveyed to the jury, or that they may prevail on this claim.

In order to prevail on a claim of constitutional error not preserved at trial, the defendants must meet all four of the conditions of *State* v. *Golding,* supra, 239–40. In this case, the defendants have failed to meet the second requirement, namely, that "the claim is of constitutional magnitude alleging the violation of a fundamental right." Id., 239. Although the defendants have *alleged* the violation of a fundamental right, namely, that the trial court, by this instruction, took "an apparent position of advocacy in [the] case before [it]," in violation of their fundamental right to due process of law, we conclude that, under the circumstances of this case, the defendants have clothed a nonconstitutional claim in constitutional garb.

We do not dispute that there may be some extreme circumstances in which the trial court may frame its instructions to the jury in such a one-sided fashion that the instructions may amount to a position of advocacy in violation of the defendant's constitutional right to an impartial tribunal. This, however, is not such a case. Taken in their entirety, the instructions were appropriately evenhanded, and the defendants do not claim otherwise. One arguably unbalanced sentence out of thirty-two pages of transcript of instructions does not persuade us otherwise.

The question, therefore, is whether that one sentence raises an issue of constitutional dimension. We conclude that it does not.

Just as every claim of evidentiary error by the trial court is not truly constitutional in nature; see, e.g., id., 241; every claim of instructional error is not truly constitutional in nature. We have recognized, for exam-

ple, that claimed instructional errors regarding the elements of an offense; see, e.g., *State* v. *Boles,* 223 Conn. 535, 543, 613 A.2d 770 (1992); and claimed instructional errors regarding the burden of proof or the presumption of innocence; see, e.g., *State* v. *Adams,* 225 Conn. 270, 289, 623 A.2d 42 (1993); are constitutional in nature, so as to satisfy the second *Golding* requirement. We have also recognized, however, that claimed instructional errors regarding general principles of credibility of witnesses are not constitutional in nature. *State* v. *Tatum,* 219 Conn. 721, 738, 595 A.2d 322 (1991). Indeed, it would trivialize the constitution to transmute a nonconstitutional claim into a constitutional claim simply because of the label placed on it by a party or because of a strained connection between it and a fundamental constitutional right.

The one sentence that the defendants challenge in this case is part of a passage that concerns the jury's general duty to consider the evidence carefully and objectively, and to render a verdict according to its view of the evidence and the law as given to it by the court. Although we do not diminish the importance of that duty to the trial process, in the absence of a showing that the instruction was likely to be misunderstood by the jurors as an admonition that they would be shirking their duty by acquitting, it strains the meaning of constitutional claims to say that this claimed instructional error is constitutional in nature.

Moreover, even if we were to advance past the second *Golding* requirement, the defendants cannot prevail on the third. Under that requirement, a defendant may prevail on an unpreserved constitutional claim of instructional error only if, "considering the substance of the charge rather than the form of what was said, it is reasonably possible that the jury was misled." (Internal quotation marks omitted.) *State* v. *McMurray,* 217 Conn. 243, 253, 585 A.2d 677 (1991). In mak-

ing this inquiry, we consider the alleged violation in the context of the entire charge and the entire trial, rather than as individual sentences or phrases viewed in isolation. See, e.g., *State* v. *Milardo,* 224 Conn. 397, 409, 618 A.2d 1347 (1993).

Applying that standard, we conclude that the defendants may not prevail on this aspect of their claim. In the particular passage at issue, the trial court charged the jury "to objectively consider the evidence with your minds unswerved from your duty by any kind of emotion or sentiment and determine your verdicts on careful consideration of the facts disclosed by the evidence and the application of the law." The court, in the same passage, instructed the jury that "[e]ach of these defendants justly relies upon you to evaluate carefully all of the evidence and to render verdicts of not guilty if the facts and the law require such verdicts." It also instructed the jury that it was its "sworn duty . . . to safeguard the rights of persons charged with crimes by respecting the presumption of innocence which the law imputes to every person so charged." In addition, in other parts of the instructions, the trial court fully informed the jury, in evenhanded and emphatic terms, regarding the necessity of proof beyond a reasonable doubt and the presumption of innocence. Thus, although there may have been some linguistic imbalance in that one sentence of the court's instructions, we conclude that, taking the instructions as a whole, there is no reasonable possibility that the jury was misled into believing that it would be performing its responsibilities only if it voted to convict.

## B

The defendants' claim that the trial court undermined the presumption of the innocence and diluted the burden of proof is based upon the following sentence in its instruction: "But you must keep in mind that those

rules of law are made to protect the innocent and not the guilty." This claim is disposed of by our recent decision in *State* v. *Stanley*, 223 Conn. 674, 695–96, 613 A.2d 788 (1992), and the cases cited therein.

## V

The defendants' three final claims require only brief discussion. Those claims are that: (1) the trial court improperly permitted the jury to view certain exhibits of the state before they were actually admitted into evidence; (2) the trial court's instructions to the jury on the element of possession did not adequately guide the jury; and (3) the trial court's instructions to the jury, regarding certain prior inconsistent statements made by Manzi and Morales at a hearing in probable cause,[25] improperly limited the effect of those prior statements to impeachment only, contrary to our holding in *State* v. *Whelan*, 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986).

Regarding the first two of these claims, we have fully considered the defendants' arguments and authorities and conclude that the claims are without merit. Regarding the third claim, Johnson requested such a charge, and neither Scott Walton nor Robert Walton took an exception. Thus, as to Johnson, no review is warranted because he induced the error. See *State* v. *Hinckley*, 198 Conn. 77, 81 n.2, 502 A.2d 388 (1985). As to the Waltons, who request reversal under the plain error doctrine, we conclude that no such action is appropriate. Although we agree with both the defendants and the state that the instructional limitation was improper under *Whelan*, we also agree with the state that the error does not rise to the level of "plain error," as that term of art is generally understood; see, e.g., *State* v.

[25] A hearing in probable cause was held in these cases because the state had initially charged the defendants with violations of General Statutes § 21-278 (a), which carries a maximum sentence of life imprisonment.

*Boles,* supra, 551; and that, in any event, the defendants have not established that the error affected the verdicts in the case.

The judgments are affirmed.

In this opinion PETERS, C. J., CALLAHAN and NOR-COTT, Js., concurred.

BERDON, J., dissenting. By incorporating the principles articulated in *Pinkerton* v. *United States,* 328 U.S. 640, 66 S. Ct. 1180, 90 L. Ed. 1489 (1946), the majority creates a new type of accomplice liability not envisioned by the legislature when it adopted General Statutes §§ 53a-8 and 53a-48, which separately delineate criminal liability for the acts of another and conspiracy, respectively. Under *Pinkerton,* a conspirator may be convicted of substantive offenses committed by a coconspirator if the offenses were within the scope of the conspiracy, were in furtherance of the conspiracy and reasonably could be foreseen as a necessary or natural consequence of the agreement. Id., 647–48. In devising our penal code, the legislature specifically limited the crime of conspiracy to pertain only to the conduct that was the subject of the agreement between the coconspirators and the overt act in furtherance of that agreement. General Statutes § 53a-48.[1]

This court does not have the authority to create a new form of accomplice liability. "To permit mere guilt of conspiracy to establish the defendant's guilt of the substantive crime without any evidence of further action on the part of the defendant, would be to expand the basis of accomplice liability beyond the legislative design." *People* v. *McGee,* 49 N.Y.2d 48, 57, 399 N.E.2d 1177, 424 N.Y.S.2d 157, cert. denied sub nom. *Quamina* v. *New York,* 446 U.S. 942, 100 S. Ct. 2166, 64 L. Ed. 2d 797 (1980).

---

[1] See footnote 2 of the majority opinion.

The majority contends that the application of the *Pinkerton* rule is consistent with Connecticut law because § 53a-4 of the penal code, the savings clause, provides: "The provisions of this chapter shall not be construed as precluding any court from recognizing other principles of criminal liability or other defenses not inconsistent with such provisions." The official commentary cautions, however, that the savings clause "does not mean . . . that the court is free to fashion additional substantive offenses, for the Code precludes, by repealing section 54-117, the notion of common law crimes."[2] Commission to Revise the Criminal Statutes, Penal Code Comments, Connecticut General Statutes Annotated (1985) § 53a-4, p. 196.

Recognizing that the new rule announced in *Pinkerton* created a new substantive offense, dissenting Justice Rutledge noted that "this ruling violates both the letter and the spirit of what Congress did when it separately defined the three classes of crime, namely, (1) completed substantive offenses, (2) aiding, abetting or counseling another to commit them, and (3) conspiracy to commit them. Not only does this ignore the distinctions Congress has prescribed shall be observed. It either convicts one man for another's crime or punishes the man convicted twice for the same offense." *Pinkerton* v. *United States,* supra, 649. The holding in *Pinkerton* offends the most basic principles of criminal law, which "has its foundation in personal and individual guilt, the essence of which is causation, and any doctrine of vicarious criminal liability is repugnant to common law concepts. . . . The causation rationale lies

---

[2] General Statutes (Rev. to 1968) § 54-117 provided: "In case of conviction for any high crime or misdemeanor at common law, or of assault with intent to kill, the offender may be imprisoned not more than fifteen years or be fined not more than five hundred dollars or both, and, in case of conviction for any other offense at common law, the offender may be imprisoned not more than one year or be fined not more than three hundred dollars or both."

behind the Criminal Code which makes liable as principal (1) the direct actor, or (2) one who 'aids, abets, counsels, commands, induces, or procures' commission of the act. The requirement that criminal statutes are to be strictly construed would seem to make this categorization exclusive and *to prohibit judicial creation of a third class to include all members of a conspiracy of which the direct actor was a member.*" (Emphasis added.) Note, "Vicarious Liability for Criminal Offenses of Co-Conspirators," 56 Yale L.J. 371, 374 (1947).

The majority notes that the basis for criticism of the *Pinkerton* principle is that the " 'law would lose all sense of just proportion' if one might, by virtue of his one crime of conspiracy, be 'held accountable for thousands of additional offenses of which he was completely unaware and which he did not influence at all.' " 2 W. LaFave & A. Scott, Substantive Criminal Law (1986) § 6.8 (a), p. 155, quoting 1 A.L.I., Model Penal Code and Commentaries (1985) § 2.06, comment, p. 307. The majority acknowledges that "[i]n an appropriate case, that criticism might well be valid."

Recognizing the inherent injustice of the *Pinkerton* rule, the majority attempts to ameliorate its unfairness by limiting its application to cases in which (1) the defendant was in control of the operation, (2) the crime was a principal object of the conspiracy, and (3) the crime was one of the overt acts alleged as part of the conspiracy. The problem with this analysis is that the trial court did not so limit the *Pinkerton* rule in its instructions to the jury in this case. We, as a reviewing court, "cannot find facts, nor, in the first instance, draw conclusions of facts from primary facts found, but can only review such findings to see whether they might legally, logically and reasonably be found." (Internal quotation marks omitted.) *State* v. *Clark,* 160 Conn. 555, 556, 274 A.2d 451 (1970).

Finally, the trial court's instruction in this case, which permitted the jury to convict the defendant Scott Walton of a new criminal hybrid of conspiracy and accomplice liability violated that defendant's constitutional right to fair notice of the charges against him. U.S. Const., amend. VI; Conn. Const., art. I, § 8.

Accordingly, I would reverse the conviction with regard to Scott Walton.