[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION 
The plaintiffs, Karen and John Fitzpatrick, sue the defendants, Joseph and Linda DeMontigny, for fraudulently inducing the plaintiffs to agree to purchase a residential property then owned by the defendants, known as 11 Manse Hill Road, Somers; tortious interference with a contract; and a violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes Chapter 735a. The defendants counterclaim against the plaintiffs for breach of contract. CT Page 252
On November 14 and 15, 2000, a trial to the court was held. The court dismissed the tortious interference and CUTPA counts of the plaintiffs' complaint at the conclusion of the plaintiffs' case.
The court finds the following facts. In March 1994, the defendants acquired the property in question from previous owners of the residence who, in turn, had bought the property from a developer. The property comprises an upscale, single family house, built around 1990, and about four acres of land. A portion of the parcel is wetlands.
Because of employment opportunities elsewhere, the defendants decided to sell this property and move to Florida. In November 1994, the defendants engaged a real estate agent, Cheryl Almeida, who listed the house on the market. Almeida prepared a brochure describing the property to prospective buyers. A few offers were received but rejected by the defendants because the offer was too low or contained a "Hubbard" clause, which would make the sale of 11 Manse Hill Road contingent on the sale of the offeror's other property.
On June 26, 1995, through Almeida and Deborah Campbell, the defendants' subagent, the plaintiffs offered to purchase the residence for $240,000. The only contingencies requested by the plaintiffs in the offer were the outcomes of structural, insect, and well inspections and tests. No mention of the viability of installation of an inground swimming pool was made at that time. This offer was rejected by the defendants as too low.
On July 8, 1995, the plaintiffs made a second offer to buy the property raising the price to $255, 000. This offer included the contingencies requested in the first offer as well as a mortgage commitment contingency and a Hubbard Clause. Again, no mention of the need to install an inground pool was communicated. The defendants turned down the offer because of the Hubbard Clause.
On July 23, 1995, the plaintiffs made a third offer similar to their second but omitting the Hubbard Clause. This offer was accompanied by a check, payable to the realtor for $100. The defendants accepted this offer, and a contract for the purchase and sale of the property was created. This contract called for the plaintiffs to pay an additional deposit of $4,900 upon acceptance. Once more, no mention of a requirement of the ability to install an inground pool was made by the plaintiffs to the defendants or their real estate agents. The contract set a closing date of September 29, 1995.
On July 25, 1995, John Fitzpatrick inquired of town officials regarding where he could lawfully park his truck on the property so as to shield it CT Page 253 from view from an abutting street. The response to his inquiry disclosed that the property contained wetlands. He related this fact to his wife, and the plaintiffs developed concerns about where an inground pool might be positioned.
The couple had further discussions with town officials and met with Campbell about their concerns. Campbell advised the plaintiffs to research the matter of the pool installation thoroughly before depositing the remaining $4,900. The result of the plaintiffs' investigation with the town officials was that an inground pool could properly be installed but not at the location which Karen Fitzpatrick preferred.
On July 27, 1995, Karen Fitzpatrick phoned Almeida about the pool issue which had arisen. Karen Fitzpatrick was upset that the pool might not be positioned where she had envisioned. Almeida informed her to delay deposit of the $4,900 until this problem was resolved. Almeida warned, however, that the property would continue to be listed and shown to other potential buyers in the interim.
Shortly thereafter, Karen Fitzpatrick phoned Campbell and told her that the plaintiffs wished to proceed with the purchase of 11 Manse Hill Road despite the possible restrictions as to pool placement. Campbell then told Karen Fitzpatrick to forward the $4,900 in compliance with the terms of the contract. Karen Fitzpatrick then called Almeida and arranged for the $4,900 to be delivered. The remaining deposit was paid on August 1 or 2, 1995.
After this, the plaintiffs continued to take steps to comply with the other provisions of the contract in anticipation of the September 29, 1995, closing date. On August 8, 1995, the house inspections occurred. The plaintiffs discovered two other items which they wished to have addressed before closing. One involved repair of a skylight, and the other the evacuation of the septic tank. The defendants were advised of these problems and agreed to repair the skylight and pay $100 toward the cleaning of the septic tank. The location of an inground pool was not broached by the plaintiffs during these discussions.
On August 29, 1995, Karen Fitzpatrick phoned Almeida to insure that the $4,900 had cleared. On September 5, 1995, John Fitzpatrick notified Almeida that the mortgage commitment had been secured with a locked in rate for the closing date. Again, on these occasions the plaintiffs raised no issue regarding the pool.
Two days later, on September 7, 1995, Karen Fitzpatrick called Almeida and indicated that she no longer wished to buy the 11 Manse Hill Road residence because the present allowable pool site would be too close to CT Page 254 the street, the cost to move the reserve leach field to locate the pool elsewhere would be too expensive, and she had developed a general bad feeling toward the residence. Almeida cautioned her to consult with an attorney.
Almeida also contacted the defendants and related this turn of events. She suggested to the defendants that they, too, consult counsel. A "sold" sign which had been affixed on the property was removed.
After the closing date of September 29, 1995, passed, the parcel was remarketed. In November 1995, the defendants contracted with new buyers. The property was eventually conveyed for $250,000 to these purchasers on January 31, 1996.
 I 
In the first count of the complaint, the plaintiffs allege that they were fraudulently induced to agree to purchase 11 Manse Hill Road by the defendants. The plaintiffs bear the burden of proving, by clear and convincing evidence, that (1) the defendants made a false representation as to fact; (2) the defendants knew the statement to be false; (3) the representation was made to induce the plaintiff to act; and (4) the plaintiffs acted to their detriment relying on the false representation,Dorsey v. Mancuso, 23 Conn. App. 629, 633 (1990); Kavarco v. T.J.E.,Inc., 2 Conn. App. 294, 295 (1984). The court determines that the plaintiffs have failed to satisfy this burden.
 A
The plaintiffs contend that false representations were made to them concerning the ability to install an inground pool on the site. The court finds that the defendants never met nor communicated any representations to the plaintiffs whatsoever. All negotiations and interactions transpired through the defendants agents, Almeida and Campbell. Neither Almeida nor Campbell ever represented to either plaintiff that an inground pool could lawfully be positioned anywhere on the parcel. The court found the testimony of Almeida and Campbell credible on this point.
The plaintiffs rely heavily on an attachment to the brochure prepared by Almeida to attempt to establish that the defendants, through their agents, misrepresented that an inground pool was legally installable on the site. The attachment is a copy of a document entitled "Declaration of Restrictions and Covenants" pertaining to the subdivision which encompassed 11 Manse Hill Road. Section 5 of that declaration states that "[n]o above-ground swimming pool shall be constructed or placed upon any CT Page 255 of the above-named lots."
The plaintiffs argue that inclusion of this declaration in the brochure misled them into believing that in inground pool could be installed because only above-ground pools were expressly prohibited. This is a flawed argument. The restrictive covenant merely declares what is forbidden by that covenant. It states nothing about what can lawfully be done. In fact, § 9 of the declaration points out that all the parcels in the subdivision are "Subject to all laws, ordinances or governmental regulations. . . ." Clearly, the activities prohibited by the declaration are in addition to state or local laws and regulations. Also, geologic or physical characteristics may limit what can be done on any particular lot.
 B 
Even if the court assumes, arguendo, that Almeida or Campbell made such a representation regarding pool installation, the plaintiffs failed to prove, by clear and convincing evidence, that the representation was false. The court heard credible testimony that the plaintiff could have placed an inground pool in a unregulated area if the plaintiffs were willing to move a reserve leach field. It was the plaintiffs' unwillingness to embark on that course rather than any legal impediment which deterred them.
Additionally, the court received credible evidence that the plaintiffs could have sought a wetlands permit which, if granted, would allow an inground pool to be placed on the site, including in a regulated portion of the four acres. The court determines that the plaintiffs have failed to demonstrate the probability or improbability of obtaining such a permit under the circumstances existing at the time at 11 Manse Hill Road.
 C 
Finally, the court finds that the plaintiffs failed to prove, by clear and convincing evidence, that they relied on any representation regarding feasibility of installing an inground pool in deciding to offer to buy 11 Manse Hill Road. The court credits the testimony of Almeida and Campbell that the plaintiffs desired to purchase the property, despite any difficulty relating to pool placement. The plaintiffs paid the additional $4,900 deposit after being told to defer payment until the pool issue was satisfactorily resolved. After the pool problem arose and was discussed with town officials and the realtors, the plaintiffs continued to apply for and obtain a mortgage commitment and arranged for other inspections to occur. The plaintiffs negotiated other issues, such as repair of a CT Page 256 skylight and pumping out of septic tank, after the pool issue was brought to light, without hesitation. These subsequent actions by the plaintiffs confirm the testimony of Campbell and Almeida that the plaintiffs were determined to pursue the acquisition of 11 Manse Hill Road notwithstanding pool installation restrictions.
For these reasons the court finds for the defendants on the first and only remaining count of the complaint.
 II 
Turning to the defendants' counterclaim, the court finds that the defendants have proven, by a preponderance of the evidence, that the parties entered into a contract for the sale and purchase of 11 Manse Hill Road; that the contract obligated the plaintiffs to pay $4,900 in addition to the $100 deposit already received upon acceptance of the plaintiffs' offer by the defendants, that the defendants were ready, willing, and able to convey the property to the plaintiffs on the contract closing date of September 29, 1995, according to the terms of the contract; and that the plaintiffs breached this contract by refusing to purchase the property despite the fact that all contract contingencies, including inspection outcomes and mortgage commitment, were successfully met.
It may be that the plaintiffs entertained second thoughts or buyer remorse concerning purchase of the property because of pool installation obstacles, but the court cannot relieve a party to a contract from the obligations thereunder because the contract proves to be an "improvident" agreement, John M. Glover Agency v. RDB Building, LLC, 60 Conn. App. 640,645 (2000).
Paragraph 14 of the purchase and sale agreement contains a liquidated damages clause which entitles the defendants to retain the $5000 deposit in the event of buyer default. This sum was, in fact, retained by the agents for the defendants. The court rules that this sum be released over to the defendants if not previously released. No further damages are allowed under the contract which states, in paragraph 14, that upon retention of the deposit for buyer's default the "Buyer and Seller shall be relieved of further liability to each other under this Contract."
A provision which allows liquidated damages for breach of contract is enforceable if three conditions are met: (1) the damage resulting from such breach is likely to be difficult to prove or uncertain in amount; (2) the parties intended to liquidate damages in advance; and (3) the liquidated amount is reasonable, Mattegat v. Klopfenstein,50 Conn. App. 97, 102 (1998). CT Page 257
In the present case, the plaintiffs' breach in failing to close by September 29, 1995, caused the defendants to incur carrying costs for the property for an additional four months, added upkeep expenses, such as heating costs and snow removal, and a loss in purchase price of $5,000. Postponement of the sale and remarketing often results in damages which are difficult to assess. The parties expressly included a liquidated damages clause in the written contract. Five thousand dollars is a reasonable sum under these circumstances.
The court concludes that judgment should enter for the defendants against the plaintiffs on the counterclaim. Because of the liquidated damages clause, the defendants are entitled to the $5000 deposit and no additional damages, CMG Realty of Connecticut v. Colonnade One Ltd.Partnership, 36 Conn. App. 653, 667 (1995).
The defendants also claim reasonable attorney's fees. Paragraph 14 of the contract allows the prevailing party to recoup attorney's fees if a legal action is brought to enforce any provision of the contract. The defendant's sought no actual damages under the counterclaim but instead sought liquidated damages under paragraph 14 of the contract. The defendants had to expend attorney's fees to defend against the plaintiffs' complaint but incurred little more in pressing the counterclaim because the defense and counterclaim cover the same ground. In this situation, an award of attorney's fees in addition to the deposit retained is inappropriate, Litton Industries Credit Corporation v.Catanuto, 175 Conn. 69, 76 (1978).
In summary, the court entered judgment for the defendants on the complaint and counterclaim but awards no additional damages to the $5000 deposit previously retained.
Sferrazza, J.